ROBERT G. DIEHL *v.* STATE OF MARYLAND

[No. 67, September Term, 1981.]

*Decided October 13, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*John H. McDowell,* with whom were *Andrew G. W. Norman* and *Paul Ottinger* on the brief, for appellant.

*Stephen Rosenbaum, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

COLE, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH and RODOWSKY, JJ., dissent. RODOWSKY, J., filed a dissenting opinion at page 480 *infra,* in which MURPHY, C. J., and SMITH, J., join.

The question presented in this case is whether it is disorderly conduct for a passenger in a car, which has been stopped by police for a traffic violation, to loudly assert that he has a right to leave the scene (punctuating the assertions with a four letter expletive) after being told by the officer to get back into the car. We summarize the facts as follows.

Vincent Gavin, Chief of Police of the Hancock Police Department, was on routine patrol during the evening of January 8, 1980, driving a marked patrol vehicle and in full uniform. At about 10:25 p.m. he heard and saw the operator of a Cougar squealing wheels on Main Street in Hancock, Maryland. As he drove up behind the Cougar, Gavin noted that there were several people in the vehicle. He pulled the vehicle over in an A & P parking lot, up the street from where he saw the traffic violation, and radioed for a back-up unit.

There is considerable conflict in the testimony as to what happened next. Gavin testified that as he was approaching the vehicle after he had stopped it in the parking lot, James Golden, the driver, got out of the car on the driver's side and Robert Diehl got out on the passenger's side. Gavin ordered both men to get back into the vehicle and Golden complied. Diehl, however, refused to get back into the car and, as the Police Chief repeated his command, Diehl began yelling, said that he knew his rights, and said that Gavin could not tell him to get back into the car. Specifically, Gavin testified that Diehl said, "Fuck you, Gavin;" "I know my rights;" "you can't tell me what to do;" and "things like that." Gavin advised Diehl that his "dealings weren't with him, they were with the driver," and again ordered Diehl into the car.

At some time during this exchange between Gavin and Diehl, Gavin advised Diehl that if he did not get back into the car he was going to be arrested. Gavin testified that "[p]eople were beginning to gather," that "[w]ithin a short time after [the car stop], they were on the street, across the street and people were stopping and looking." Diehl refused to get into the car and Gavin arrested him for "screaming obscenities and . . . drawing a crowd."

Gavin further testified that Diehl refused to submit to arrest; that after he was handcuffed, Diehl began kicking and struggling, lying on the ground, and refused to get into the patrol vehicle. By this time Officer Simmons of the State Natural Resources Police, who happened to be in a store across the street when this was happening, came to Gavin's assistance and the two of them were able to force Diehl into Gavin's cruiser. However, Gavin became involved in a fracas between another individual and another police officer on the same parking lot and Diehl used this opportunity to flee from the police car.

About a half hour later, Diehl, lying under a loading ramp of the A & P, was apprehended by Trooper Blenard of the Maryland State Police. Diehl refused to stand up and the trooper dragged him across the parking lot. When they arrived at Trooper Blenard's cruiser Diehl again began kicking and screaming. With the assistance of another

trooper, Trooper Blenard placed Diehl into the police car. Trooper Blenard was treated for a minor injury to his finger and Gavin received bruises to his legs for which he did not seek treatment.

Diehl's testimony was that after Gavin pulled the car over in the parking lot he physically yanked Diehl out of the car and arrested him for trespassing on the parking lot. Diehl denies using the language Chief Gavin accused him of using but testified that after he was placed under arrest he told the chief he was "full of shit" and "a crazy son-of-a-bitch." According to Diehl after he was arrested a struggle ensued and the chief got Diehl on the ground and began beating him. He denied assaulting any of the officers. Diehl was charged with two counts of assault and battery, two counts of resisting arrest, and disorderly conduct. He prayed a jury trial and was subsequently tried by a jury in the Circuit Court for Washington County. Diehl made a motion for judgment of acquittal at the end of the State's case and at the close of all the evidence. The trial judge denied the motions and the jury subsequently convicted Diehl of disorderly conduct and two counts of resisting arrest but found him not guilty on each assault charge. Diehl was sentenced to three consecutive terms: thirty days for disorderly conduct and three years for each charge of resisting arrest.

Diehl appealed his conviction to the Court of Special Appeals. The case was briefed and argued before that court. However, prior to reaching a decision on the merits the intermediate court, under the authority of Maryland Rule 1015(a), certified the entire matter in controversy to this Court. Pursuant to Rule 815 (c), this Court granted the application for certification and issued its writ of certiorari to consider the important issues presented.

Diehl was charged with a violation of Maryland Code (1957, 1976 Repl. Vol.), Art. 27, § 121 which provides in pertinent part that

> Any person ... who shall wilfully disturb any neighborhood in ... [any] city, town or county [of this State] by *loud and unseemly noises,* or shall

*profanely curse and swear or use obscene language* upon or near to any such street or highway within the hearing of persons passing by or along such highway . . . shall, upon conviction thereof, be sentenced to a fine of not less than one dollar and not more than one hundred dollars or shall be subject to imprisonment for not more than thirty days, or shall be subject to both such fine and imprisonment, in the discretion of the court and shall pay costs of the prosecution. [Emphasis supplied.] [1]

Diehl contends that, interpreting the evidence in the light most favorable to the State,[2] his language was not obscene as that term is constitutionally defined; that the words exchanged with Chief Gavin were not fighting words; that he did not make loud and unseemly noises as there was no evidence that people were disturbed, incited, or offended; and that, as mere loudness is not enough to constitute disorderly conduct, there was no probable cause for his arrest. Diehl further maintains that, since there was no probable cause for his arrest, he was justified in using reasonable force to resist the arrest and, therefore, the resisting arrest convictions should fall with the disorderly conduct conviction.

The State, on the other hand, urges two grounds for sustaining Diehl's conviction for disorderly conduct. First, it maintains that Diehl violated Article 27, Section 121 by making loud and unseemly noises in refusing "to obey Gavin's proper order." Second, it claims Diehl used speech toward Gavin intended to incite Gavin to violence and as

---

1. Although the statute does not characterize it as such, the conduct proscribed is commonly referred to as disorderly conduct. For clarity and convenience we will hereafter refer to the alleged violation as disorderly conduct.

2. When a defendant in a criminal case being tried before a jury moves for a judgment of acquittal at the close of the evidence offered by the State or at the close of all the evidence the function of the appellate court is limited to ascertaining whether there is any relevant evidence, properly before the jury, legally sufficient to sustain a conviction. *See* State v. Devers and Webster, 260 Md. 360, 371, 272 A.2d 794, *cert. denied,* 404 U.S. 824, 92 S. Ct. 50, 30 L.Ed.2d 52 (1971).

such the words used were unprotected by the First Amendment [3] under the "fighting" words doctrine laid down in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S. Ct. 766, 86 L.Ed. 1031 (1942). We shall first address the State's argument under the statute.

Article 27, Section 121's proscription against "profanely curs[ing] and swear[ing] or us[ing] obscene language" obviously, by its very terms, will often attempt to regulate speech. However, because of the general nature of the phrase "loud and unseemly noises," the State argues that this aspect of § 121 applies to verbal behavior, and as such is a non-speech regulation, the purpose of which is to maintain some kind of order in "neighborhoods" by the prohibition of disruptive oral conduct. In order to determine whether a speech interest is involved here, we shall examine the circumstances surrounding Diehl's utterance in light of his intention and action at the precise time. For if the words that caused the arrest were uttered or shouted in order to convey a message, then some accepted reason must be found for excluding them from First Amendment safeguards; if however, the verbal conduct was noncommunicative but, nevertheless could be reasonably expected to cause a potentially violent disruption, then there was no speech interest involved and the conduct may be constitutionally controlled.

Diehl's oral communication in this situation clearly constituted speech. Our examination of the record indicates that Gavin ordered Diehl to get back into the car; however, the officer did not have any right to make this demand on Diehl. Only then did Diehl begin to address Gavin. Diehl's communication expressed his outrage with this unlawful police conduct, it was addressed only to Gavin (he was not trying to disturb others or exhort them to breach the peace), and his words were chosen to emphasize his outrage (not to offend others). Gavin's order precipitated the entire episode; Diehl's speech was merely a response. Even the time and decibel level of this response was a communication that,

---

**3.** The First Amendment to the United States Constitution guarantees to each citizen the right of freedom of speech.

although distasteful, should not have been surprising to Gavin.

Once this communication has been defined as speech, it is clear that the statute does not apply in light of Diehl's First Amendment rights in this communication. Section 121 proscribes conduct when the offender: (1) "wilfully disturb[s] any neighborhood by loud and unseemly noises," or (2) "profanely curse[s] and swear[s] or use[s] obscene language" at a place within the hearing of persons passing by.

Diehl's speech does not meet the elements of the first possible proscription. Diehl did not *wilfully disturb* anyone. Diehl was speaking to Gavin. His actions were motivated solely as a response to Gavin's order. The evidence simply does not indicate that Diehl *intended* to disrupt the quiescence of the neighborhood. People might have begun to stop, look and listen, forming a crowd; however, there also is no evidence showing that any of the observers was disturbed — they probably were mere curiosity seekers. Based on the evidence we cannot conclude that Diehl wilfully caused a disturbance.

Diehl's speech also cannot qualify as a *loud and unseemly noise* under the first proscription. As speech protected by the First Amendment, Diehl's conduct must have advocated imminent lawless action and been likely to incite a breach of the peace in order to be proscribable by the State. *See Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S. Ct. 1827, 23 L.Ed.2d 430 (1969); *Hess v. Indiana*, 414 U.S. 105, 108, 94 S. Ct. 326, 38 L.Ed.2d 303 (1973). Here Diehl was addressing Gavin; he was not exhorting others to breach the peace. As we see it, the statute is not intended to prevent a citizen, outraged by police misconduct toward him, from loudly protesting such misconduct. Of course, we hasten to add, that if the citizen goes beyond the bounds of the protest and seeks to enlist the crowd to interfere with the police officer and consequently precipitates public disorder amounting to a breach of the peace, the police officer may, under such circumstances, take steps to quell the disorder, even to the extent of arresting the citizen. However, those are not the facts in the case *sub judice.*

The Supreme Court of California in construing the terminology of a statute regarding "loud and unusual noise" held in *In Re Brown,* 9 Cal. 3d 612, 108 Cal. Rptr. 465, 510 P.2d 1017 (1973), *cert. denied, California v. Brown,* 416 U.S. 950, 94 S. Ct. 1959, 40 L.Ed.2d 300 (1974) that

> The statute, however, cannot be interpreted consistent with the First Amendment and traditional views as making criminal all loud shouting or cheering which disturbs and is intended to disturb persons. [Footnote omitted.] When the word noise in the statute is properly construed consistent with the First Amendment and traditional views, it encompasses communications made in a loud manner only when there is *a clear and present danger of violence or when the communication is not intended as such but is merely a guise to disturb persons.* [*Id.* at 1021.] [Emphasis supplied.]

The State's evidence failed to establish that Diehl's conduct, under the circumstances here, was unlawful under this first portion of § 121.

Diehl's conduct also cannot be shown to be unlawful under the second proscription outlined in § 121. For even if we assume, which we do not, that profanely swearing or cursing, by itself, in public is under all circumstances forbidden, Diehl did not *profanely curse or swear.* Although evidence indicates that Diehl uttered one swear word, the statute clearly states that not all such words are proscribed. Only words that also qualify as profane are prohibited. The Supreme Court of Rhode Island has defined "profane" as "importing an imprecation of divine vengeance or implying divine condemnation or irreverance toward God or holy things." *State v. Authelet,* 385 A.2d 642, 644 (R.I. 1978). Diehl's statement neither invoked divine power nor was it specifically irreverent toward "God or holy things." Therefore, the State has failed to show that Diehl violated this aspect of the second proscription.

Nor do we find that Diehl *used obscene language.* The test for obscenity, established beyond question, is that it must be

erotic. *See Roth v. United States,* 354 U.S. 476, 77 S. Ct. 1304, 1 L.Ed.2d 1498, *reh. den.,* 355 U.S. 852, 78 S. Ct. 8, 2 L.Ed.2d 60 (1957). The term erotic denotes a tendency to excite sexual desire, not to provoke violence. It requires no discussion to conclude that Diehl's comment was neither intended to, nor did it, excite sexual desire in Chief Gavin.

In sum, the record does not show that Diehl's conduct satisfied *any* of the elements of § 121. Nor can we find that Diehl did anything unlawful. There is no testimony of any complaint by the owners of the stores adjacent to the parking lot that Diehl's protest interfered with the conduct of their business or the travel of their customers. Even Gavin does not suggest that Diehl attempted to interfere with him in issuing Golden a traffic violation.

As we see it then, the State urges us to adopt its second argument, addressed in its brief and argued before us, that Gavin had a right to arrest Diehl for saying "Fuck you, Gavin". The State maintains that under the circumstances Gavin was "an individual addressee of speech having a direct tendency to provoke him to violence." The question then is whether Diehl is guilty of using "fighting words" not entitled to First Amendment protection and which were intended to incite Gavin to breach the peace.

Government regulation of speech has been allowed when the purpose of the statute was to proscribe "fighting words." In the seminal case of *Chaplinsky v. New Hampshire, supra,* the Supreme Court defined "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* at 572 (footnote omitted). Such words are not constitutionally protected because their "slight social value as a step to truth... is clearly outweighed by the social interest in order and morality." *Id.* (footnote omitted). Thus, the Court ruled that a breach of the peace could be upheld when there is merely a danger the listener will be incited to violence. The Court affirmed Chaplinsky's, a Jehovah's Witness, conviction based on his encounter with the City Marshal of Rochester whom he described as a "Goddamned racketeer and a damned facist." This decision may be interpreted as holding that fighting

words would produce an uncontrollable impulse to violence and thus their harm easily outweighed their social value. The Court did not consider whether marshals or policemen could be expected to resist epithets which would produce violent responses in the average citizen.

Later decisions following *Chaplinsky* indicate the Supreme Court's desire to limit the broad implications of the doctrine and to recognize that the use of an offensive expletive does not, by itself, deprive speech of protection. Such speech may still have social value. In *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Supreme Court refused to classify the expression, "Fuck the Draft" as fighting words when lettered on the back of a jacket worn in the public corridors of a courthouse. The Court said

> While the four-letter word displayed by Cohen in relation to the draft is not uncommonly employed in a personally provocative fashion, in this instance it was clearly not "directed to the person of the hearer." *Cantwell v. Connecticut,* 310 U.S. 296, 309, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940). No individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult. Nor do we have here an instance of the exercise of the State's police power to prevent a speaker from intentionally provoking a given group to hostile action. [*Id.* at 20.]

The Court rejected the proposition that "the States, acting as guardians of public morality, may properly remove [an] offensive word from the public vocabulary." *Id.* at 22-23. In *Cohen,* then, the Supreme Court shifted the emphasis from the words themselves to the context in which they were uttered and thereby limited the doctrine as announced in *Chaplinsky.*

In other recent cases, the Supreme Court, apparently not favoring prosecutions for fighting words, has employed the vagueness and overbreadth standards to avoid upholding

convictions.[4] In *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the appellant was convicted on two counts of using "opprobrious words or abusive language tending to cause a breach of the peace" contrary to a Georgia statute. The words spoken to police officers were "White son of a bitch, I'll kill you," "you son of a bitch, I'll choke you to death," and "you son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces." Without considering the constitutionality of punishing Gooding's words under a narrowly drawn statute, the Court found the statute as construed by the state courts void on its face because it was not limited to words having "a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." 405 U.S. at 524.

Recently in *Downs v. State,* 278 Md. 610, 366 A.2d 41 (1976), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), this Court, in an opinion by Chief Judge Murphy, discussed the development of the fighting words doctrine and applied the doctrine to the facts of that case. *Downs* presented a situation somewhat similar to the instant case, yet, in at least one important respect, different. In *Downs* the defendant, while engaged in a conversation with friends in a restaurant, referred to the police and Blacks in a loud and derogatory manner, interspersing a variety of vulgarities (including the adjective "fucking") in his conversation. There were several people in the restaurant at the time, including some Blacks and a State Trooper. This Court held that, even though the views expressed might be offensive to someone who overheard them, they

---

4. Subsequent to Gooding v. Wilson, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the Supreme Court has summarily vacated and remanded to state courts for reconsideration convictions under statutes proscribing offensive language in terms broader than the definition of "fighting words" approved in Chaplinsky v. New Hampshire, 315 U.S. 568, 92 S.Ct. 766, 86 L.Ed. 1031 (1942). *See* Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974). *See also,* Lucas v. Arkansas, 416 U.S. 919, 94 S.Ct. 1917, 40 L.Ed.2d 277 (1974); Kelly v. Ohio, 416 U.S. 923, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974); Rosen v. California, 416 U.S. 924, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974); Karlan v. City of Cincinnati, 416 U.S. 924, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974); Rosenfeld v. New Jersey, 408 U.S. 900, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972); Brown v. Oklahoma, 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 326 (1972).

were not directed to such persons and, as a result, were not under the rubric of fighting words.

Diehl's words were not addressed to the group of onlookers; the words were addressed directly to Chief Gavin. In this respect the case *sub judice* differs markedly from *Downs* and requires further analysis.

We first note that there is some question as to whether words addressed to the police can be classified as "fighting words," or whether a different and higher standard applies when the addressee is a police officer. In *Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), Justice Powell, in a concurring opinion, noted that

> a properly trained officer may reasonably be expected to "exercise a higher degree of restraint" than the average citizen, and thus be less likely to respond belligerently to "fighting words." 408 U.S. 913. [*Id.* at 135 (citation omitted).]

The Model Penal Code suggests a higher standard applies to police because: the police officer's role in the situation is that of victim and judge; police officers are frequently in disturbing situations; such circumstances are one of the hazards of the officer's trade; police are trained to maintain order and would be less likely to be provoked to disorderly responses.[5] Model Penal Code § 250.2, Comment 7 (1980).

We need not extend our holding this far, however. *Downs,* following *Cohen v. California, supra,* teaches us that the use of the word "fuck" is not punishable in the absence of compelling reasons. *Downs v. State, supra,* 278 Md. at 618. In the instant case, Gavin initiated the exchange by ordering

---

5. International Association of Chiefs of Police Training Key Vol. I, No. 37 (1968-69) at page 76 advises the officer that:

> when dealing with traffic violators, officers must expect to encounter reactions based upon emotions rather than logic and reason. The range of responses which persons will display when stopped for a violation may go from mild anxiety to blind rage or hysteria. The primary lesson here is that the officer must maintain calm regardless of the provocation offered by the motorist. Secondly, he must, if necessary, try to calm the motorist before allowing him to resume his driving.

Diehl back into the car. Diehl's reply, though characterized by Gavin as loud and hostile, was no more than an emotional and emphatic response to Gavin's order. It was not a personally abusive epithet hurled to invoke immediate and violent response. Indeed, there is no evidence that Gavin felt insulted. When asked what the basis for the arrest was he replied, "I arrested him because he was screaming obscenities and he was drawing a crowd." Diehl's use of vulgar language does not evolve into a crime simply because persons in the area stopped, looked, and listened.

There is further reason Diehl's expressions cannot be considered fighting words. When Gavin ordered Diehl to get back into Golden's car he was exceeding the bounds of his authority. Diehl was not suspected of any wrongdoing. As Gavin put it, his dealings were with the driver. There is no reason Diehl could not have gotten out of the car at this point and simply walked away.

Gavin testified at trial that the reasons he commanded Golden and Diehl to get back into the car were to maintain order and in response to a concern for his own safety. These are ordinarily legitimate and weighty concerns.[6] However, we do not see that they apply here nor are they sufficient, considering the facts of this case, to warrant the exercise of such authority.

We conclude, therefore, that Diehl had a right to verbally protest this unlawful exercise of police authority. He was specifically addressing Chief Gavin and not exhorting anyone to breach the peace. Apparently Diehl perceived Gavin's order to get back into the car as a rank encroachment on his freedom of movement and was prompted thereby to use words which, though distasteful, forcefully conveyed

---

**6.** International Association of Chiefs of Police Training Key, Vol. XI, Issue 253 (1978) at p. 75 states that "[u]nder ideal conditions, the violator should be told to remain seated in his vehicle. If he gets out have him stand on the curb side of the vehicle. . . ." The Training Key does not advise the officer to order a violator back into the car but advises that the violator be directed to a safe place to stand. This would coincide with Training Key Vol. 1 cited in footnote 3, advising the officer to do his best to maintain a calm and orderly scene.

the intensity of his objection. As the Supreme Court said in *Cohen,*

> we cannot overlook the fact, because it is well illustrated by the episode involved here, that much linguistic expression serves a dual communicative function: it conveys not only ideas capable of relatively precise, detached explication, but otherwise inexpressible emotions as well. In fact, words are often chosen as much for their emotive as their cognitive force. . . . Indeed, as Mr. Justice Frankfurter has said, "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures — and that means not only informed and responsible criticism but the freedom to speak foolishly and without moderation." *Baumgartner v. United States,* 322 U.S. 665, 673-674, 64 S.Ct. 1240, 1245, 88 L.Ed. 1525 (1944). [*Id.* at 25-26.]

In such tense moments, one man's vulgarity may well be another's vernacular.

We conclude, therefore, that where, as here, a person is acting in a lawful manner (a passenger getting out of a stopped car) and is the object of an unlawful police order, it is not usually a criminal violation for such person to verbally protest a police officer's insistence upon submission to such an order. We hold that the State failed to make out a *prima facie* showing of a violation of § 121 and, therefore, the trial judge erred in not granting Diehl's motion for a judgment of acquittal at the conclusion of the State's case or at the close of all the evidence. *See* Rule 756 (a).

Having concluded that there was no probable cause for Diehl's arrest for disorderly conduct, since Diehl's verbal response was precipitated by an unlawful police order, it is obvious that, in these circumstances his convictions for resisting arrest must also fall. It is settled law that "one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary." *Sugarman v. State,* 173 Md. 52, 195 A. 324 (1937); *see also, Rodgers v. State,* 280 Md. 406, 373 A.2d 944,

*cert. denied,* 434 U.S. 928, 98 S. Ct. 412, 54 L.Ed.2d 287 (1977); *White v. Morris,* 345 So.2d 461 (La. 1977) (suggesting a possible constitutional right under the Fourth and Fourteenth Amendments to resist an unlawful arrest).

In the instant case Chief Gavin and Trooper Blenard testified that Diehl kicked, struggled, and tried to pull away. The only injuries sustained by the officers were minor ones. Under the circumstances, Diehl used reasonable force to resist the unlawful arrest. We conclude, therefore, that Diehl's motions for judgments of acquittal should have been granted as to the resisting arrest charges as well.

> *Judgment of the Circuit Court for Washington County reversed. County to pay the costs.*

*Rodowsky, J. dissenting:*

I respectfully dissent from the reversal by the majority of Diehl's convictions for resisting arrest. In my judgment there was sufficient evidence from which the jury could find probable cause to arrest for disorderly conduct.

Cross-examination by Diehl's counsel of Chief Gavin elicited the following:

> Q. And now you're saying that you arrested him because he refused to get back into the car?
>
> A. No sir, I don't say that.
>
> Q. Alright. Why did you arrest him?
>
> A. I advised him to get back into the vehicle, advised him several times. He began *screaming* obscenities saying "Fuck you. I know my rights." I kept telling him to get back into the car, that I had no dealings with him. There was strictly a car stop for spinning wheels.
>
> Q. And then you did arrest him because he would not get back into the car?
>
> A. No, I arrested him because he was *screaming* obscenities *and he was drawing a crowd.*
>
> Q. And he said "Fuck you"?

A. Several times.

Q. Several times? And then you arrested him?

A. After I advised him that if he didn't get back into the car that I would arrest him, yes, I did.

Q. So really you arrested him because he refused to get back into the car?

A. No sir. [Emphasis added.]

Previously Gavin had testified that Diehl was "yelling" obscenities and that his tone of voice was "[l]oud and hostile." Gavin said that people "were beginning to gather" but he could not tell where they were coming from because he was directing his attention to Diehl and to the driver, Golden, at the time. When asked to estimate the number of people on the parking lot, Gavin said:

At the time of the car stop there was very few. Within a short time after, they were on the street, across the street and people were stopping and looking.

Under hornbook law, this testimony established a *prima facie* case of garden variety disorderly conduct. L. Hochheimer, *Crimes and Criminal Procedure* (2d ed. 1904) § 392, states that "collecting a crowd or numbers of persons in a public place by means of loud and unseemly noises or language" was a crime at common law.

This Court said the same in *Drews v. State,* 224 Md. 186, 167 A.2d 341 (1961), *vacated and remanded on other grounds,* 378 U.S. 547, 84 S. Ct. 1900, 12 L. Ed. 2d 1032 (1964), *reaffirmed on remand,* 236 Md. 349, 204 A.2d 64 (1964), *appeal dismissed and cert. denied,* 381 U.S. 421, 85 S. Ct. 1576, 14 L. Ed. 2d 693 (1965).

It is said that there was no common law crime of disorderly conduct. Nevertheless, it was a crime at common law to do many of the things that constitute disorderly conduct under present day statutes, such as making loud noises so as to disturb the peace of the neighborhood, *collecting a crowd in a public place by means of loud or unseemly noises or*

*language,* or disturbing a meeting assembled for religious worship or any other lawful purpose. *Hochheimer on Crimes and Criminal Procedure,* Sec. 392 (2nd Ed.); 1 *Bishop on Criminal Law,* Sec. 542 (9th Ed.); *Campbell v. The Commonwealth,* 59 Pa. St. Rep. 266.

The gist of the crime of disorderly conduct under Sec. 123 of Art. 27, as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, *disturbs,* incites, or tends to incite, a number of people gathered in the same area. 3 Underhill, *Criminal Evidence,* Sec. 850 (5th Ed.), adopts as one definition of the crime the statement that it is conduct "of such a nature as to affect the peace and quiet of persons who *may* witness the same and who *may* be disturbed or provoked to resentment thereby." [224 Md. at 192, 167 A.2d at 343-44 (emphasis added).]

Judge Orth, writing for the Court of Special Appeals in *Matter of Nawrocki,* 15 Md. App. 252, 257, 289 A.2d 846, 849 (1972), said with respect to § 121: "We do not believe it necessary that the State prove such other persons in fact heard the noises; it would be sufficient if they were passing by or along the highway so that reasonably they may have heard them." *See also State v. Johnson,* 112 Ariz. 383, 542 P.2d 808 (1975).

It seems to me necessarily to follow that Gavin had probable cause to arrest for disorderly conduct.

The Court holds that, under the circumstances of the instant case, the evidence was legally insufficient to convict for disorderly conduct. This is because the loud and unseemly language which was being yelled by Diehl and which was drawing a crowd constituted speech. I agree that Diehl's "speech" was directed to Gavin as a protest. Diehl was protesting what he considered to be an unjustifiable directive from Gavin. Because Diehl's conduct was protected by the First Amendment, in order to present sufficient evidence to support a conviction the State must show more than

loud and unseemly noises which were drawing a crowd. When the noise is also speech, the additional elements of disorderly conduct, as defined by the majority, are conduct which advocates "imminent lawless action and [which is] likely to incite a breach of the peace . . . ." I agree that in this case there was no proof that the additional elements existed at the time the arrest was made.

But insufficiency of the evidence to convict is not to be equated with an absence of probable cause. *See Gueory v. District of Columbia,* 408 A.2d 967 (D.C. 1979) (affirming, based on probable cause as a matter of law, a directed verdict in favor of a police officer, as defendant in a civil action of false arrest for disorderly conduct, when the plaintiff had previously been acquitted of the criminal charge); *State v. Dwyer,* 317 So. 2d 149 (Fla. Dist. Ct. App. 1975) (acquittal on a charge of disorderly conduct does not bar a subsequent prosecution for resisting the disorderly conduct arrest which need only be based on probable cause); *State v. Velas,* 537 S.W.2d 881 (Mo. Ct. App. 1976) (jury verdicts of not guilty of disorderly conduct but guilty of resisting arrest are not inconsistent, because the latter offense requires only probable cause to make the arrest lawful); *State v. Harris,* 286 N.W.2d 468 (N.D. 1979) (passenger in car stopped by police was lawfully arrested for disorderly conduct when he used loud and abusive language to the police, so that seizure of drugs incident to arrest was proper even though passenger was never charged with disorderly conduct).[1]

Because of the overlay of the First Amendment on the facts of this case, the Court has construed § 121 to require additional elements beyond the garden variety, public nuisance type of disorderly conduct for which Diehl was arrested. These additional requirements have been enunci-

---

1. Indeed, in a number of decisions disorderly conduct convictions have been based on the use of loud and abusive language to a police officer when third persons were present in, or attracted to, the area. *See, e.g.,* City of Chicago v. Morris, 47 Ill. 2d 226, 264 N.E.2d 1 (1970); People v. Scheck, 42 Ill. App. 2d 117, 191 N.E.2d 645 (1963); Whited v. State, 256 Ind. 386, 269 N.E.2d 149 (1971), *clarified,* 256 Ind. 618, 271 N.E.2d 513 (1971); Commonwealth v. Harris, 101 Mass. 29 (1869); People v. Doyle, 21 Misc. 2d 38, 195 N.Y.S.2d 770 (1960); People v. Jones, 63 N.Y.S.2d 399 (1946).

ated in order to avoid an unconstitutional application of the statute. From the standpoint of probable cause, I see no reason to treat the arrest made by Gavin in this case differently than an arrest made under a statute which is later declared to be unconstitutional.

In *Michigan v. DeFillippo*, 443 U.S. 31, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979), the defendant had been arrested for violation of a Detroit ordinance which made it unlawful for a person stopped by a police officer to refuse to identify himself. A search of the defendant incident to the arrest revealed controlled substances for the possession of which the defendant was convicted in the trial court. This conviction was reversed by the Michigan Court of Appeals which held the ordinance to be unconstitutionally vague and which held both the arrest and search to be invalid. The United States Supreme Court reversed and remanded because the search was incident to a valid arrest. The Court first pointed out that the

> validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest. We have made clear that the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest. [*Id.* at 36, 99 S. Ct. at 2631, 61 L. Ed. 2d at 349.]

The arresting officer in *DeFillippo* had had probable cause to believe that the defendant's conduct violated the terms of the ordinance, and the subsequent invalidation of the ordinance did not extinguish the probable cause for the arrest. At the time of the arrest

> there was no controlling precedent that this ordinance was or was not constitutional, and hence the conduct observed violated a presumptively valid ordinance. A prudent officer, in the course of determining whether respondent had committed an

offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional. [*Id.* at 37-38, 99 S. Ct. at 2632, 61 L. Ed. 2d at 350.]

See also *Johnson v. Palange,* 406 A.2d 360 (R.I. 1979); *State v. Roper,* 274 S.C. 14, 260 S.E.2d 705 (1979).

Here, Officer Gavin, while being vulgarly abused by a person whose yelling and screaming was drawing a crowd, was, in my view, entitled to rely on the terms of the statute and on the case law statements of what traditionally has constituted disorderly conduct. Gavin was not required to anticipate that this Court would hold that there was an absence of legally sufficient evidence to support a conviction unless he waited for Diehl to advocate imminent lawless action by the gathering crowd. Few, if any, lawyers would be able to produce split second precognition of a First Amendment holding under the circumstances faced by Gavin.

Nevertheless, the majority holds that Gavin was justifiably roughed about while attempting to effect the arrest, because it is said that his direction to Diehl to get back into Golden's car was "unlawful." " '[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo, supra,* 443 U.S. at 37, 99 S. Ct. at 2632, 61 L. Ed. 2d at 349-50. Diehl was not arrested for failure to obey the lawful command of a police officer. The arrest was for drawing a crowd by loud and unseemly noises.

However, the lawfulness *vel non* of Gavin's order was not an issue which was presented in the trial court. Diehl did not request any instruction that the order to get back into the automobile was unlawful and did not except to the failure of the trial court to instruct the jury that the order was unlawful. Diehl's counsel did not argue to the jury that the order was unlawful. In his brief in this Court, Diehl did not argue that the order was unlawful. His point on the

invalidity of the arrest was that "no obscenities were uttered and . . . no one was disturbed by any loud statements made by" him.

The way this case was tried, Gavin's order was treated as one of the factual circumstances which was before the jury. On the charges of resisting arrest, the jury was instructed in terms of probable cause to arrest. The guilty verdicts on the resisting arrest counts reflect a jury finding of probable cause. Thus the issue on this appeal is whether the evidence was legally insufficient even to support a finding of probable cause to arrest. For the reasons previously stated, I believe the facts were sufficient to constitute probable cause to arrest for disorderly conduct.

But even if in some way the lawfulness of Gavin's order becomes dispositive of probable cause to arrest for disorderly conduct, its lawfulness should be measured by the test set forth in *Drews v. State, supra,* 224 Md. at 193, 167 A.2d at 344. There we quoted with approval from *People v. Galpern,* 259 N.Y. 279, 284-85, 181 N,E. 572, 574 (1932) to the effect that the refusal to obey an order (to move on) of a police officer " 'can be justified only where the circumstances show conclusively that the police officer's direction was purely arbitrary and was not calculated in any way to promote the public order.' "

The facts of the instant case occurred beginning about 10:25 p.m. on a Tuesday night. Officer Gavin was alone in his patrol car, parked on the lot of a market at Virginia Avenue and Main Street in Hancock. He first heard squealing wheels and then observed a Cougar, westbound on Main Street, stopping and spinning wheels. One headlight was out. When he pulled the car over on the A & P parking lot, about 75 feet away, there appeared to be five or six occupants of the car. Under the defense testimony, there were three occupants of the car, other than Diehl, all of whom were men. Two were age 26 and one age 35. Diehl was 38 years old. Gavin radioed for a backup because of the manner in which the Cougar was being operated and because of the number of people in the vehicle. He did this for his "own safety." When the Cougar was stopped, Golden

got out from the driver's side and Diehl got out from the passenger side. It is at this point that Gavin told Golden and Diehl to get back into the car. Golden complied, but Diehl began disputing the request. There is no direct evidence that Diehl got out in order to walk away. The inference is that Diehl got out in order to inject himself into Gavin's concern with Golden's method of driving.

On cross-examination by Diehl's counsel Gavin then testified:

> Q. Well, now at that time what had Diehl done that was in your opinion a violation of the law?
> A. At that point to get back in the car, no problem. I just wanted to maintain the scene for my own safety.
> Q. Well, you had already radioed for help?
> A. Yes sir, but it's a long time in coming up in Hancock.
> Q. Were you concerned about your safety?
> A. Sir, I'm always concerned about my safety.
> Q. And you felt you couldn't handle the situation?
> A. I felt that . . .
> [STATE'S ATTORNEY]: Objection.
> THE COURT: Sustained. He didn't say that. He said he was concerned. He had a right to be, he's got a carload of people in front of him and he's by himself.

As matters actually developed, the first assistance to arrive on the scene was a Department of Natural Resouces officer who had been in the market to the east on Main Street where Gavin had originally observed the Cougar. That officer was told by someone who came into the store that there was a fight at the A & P parking lot. The radio backup was a State Police trooper who placed his arrival at the A & P lot at 10:32 p.m.

When Gavin, alone at night, was confronted with two men simultaneously getting out of a car in which there were other young male occupants, when he knew from the way in

which the car had been driven that he might be dealing with persons who were intoxicated, and when he knew that his backup might be a long time coming, it was not unreasonable as a matter of law that Gavin, for his own protection, direct the occupants, including Diehl, back into the car so that Gavin "could maintain order at the scene" because he "felt if everyone is getting out of the car, it would be chaotic."

For these reasons I would affirm the judgments of guilty of resisting arrest.

Chief Judge Murphy and Judge Smith have authorized me to state that they join in the views expressed in this dissenting opinion.