835 A.2d 575

**Rhonda Michelle POLK**

v.

**STATE of Maryland.**

**No. 101, Sept. Term, 2002.**

Court of Appeals of Maryland.

Nov. 12, 2003.

2

Stacy W. McCormack, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), of Baltimore, for petitioner.

Devy Patterson Russell, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), of Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

As the result of a contretemps at a hospital between Petitioner, Rhonda Michelle Polk, and a special police officer, Corporal Raymond Sperl, Polk was convicted of disorderly conduct in violation of Md.Code (1957, 1996 Repl.Vol., 2001 Supp.), Art. 27 § 121(b)(3) ("A person may not willfully fail to obey a reasonable and lawful order of a law enforcement officer made to prevent a disturbance to the public peace.") [1] and resisting arrest. We agree with the Circuit Court for Wicomico County and the Court of Special Appeals that facts placed before the trial court were sufficient to support those convictions and, therefore, shall affirm the judgments.

## I.

On the afternoon of 8 June 2001, Polk, accompanied by her nine-year-old daughter, went to the Peninsula Regional Medical Center in Salisbury, Maryland. Polk previously worked as a secretary in the Hospital's Heart Center, but her employment had been terminated recently. She returned on this occasion to pick up her final pay check.

Polk first visited the Human Resources Department for her pay check, but was directed to go to the Heart Center. When

---

1. § 121(b)(3) has been recodified, without substantive change, at Md. Code (1974, 2002 Repl.Vol.), § 10–201(c)(3) of the Criminal Law Article. Throughout this opinion, we shall refer to the statute by its numeration as of the operative events of this case.

she reached the Heart Center, she was told by her former supervisor, Shannon Brady, that her check was not at the Center and that she should return to Human Resources. Soon after Polk, muttering insults under her breath, left for Human Resources, Brady located the pay check. To avoid further interaction with Polk, Brady contacted Hospital security to have the check delivered to her at Human Resources.

Corporal Raymond Sperl, a special police officer stationed at the Hospital for security, responded to Brady's request. He carried the check to Human Resources and there encountered Polk. When Polk asked him about the pay check, Corporal Sperl replied that he "ha[d] to take it to personnel." Polk responded, "[F]uck you, asshole." As the officer continued toward Human Resources with the check, Polk began "screaming," "[G]ive me my check." A Human Resources employee indicated to Corporal Sperl that he could give Polk the check. Polk snatched it from him, adding another, "[F]uck you, asshole." Corporal Sperl described the exchange that followed as Polk walked down a hallway toward a Hospital exit:

> I said just keep your mouth quiet and leave. Again, [she responded] fuck you, asshole. I said I feel sorry for your child, she had a child with her. After I said I feel sorry for your child, she said fuck you, asshole. I said keep your mouth quiet and leave or I'm going to lock you up for disorderly conduct.

The officer also commanded Polk to "keep [her] mouth shut, stop [her] cursing, [and] just leave the property." Polk called Corporal Sperl an "old white baldheaded cop wannabe." In the course of their exchange, the Corporal stressed several times that "she'd be locked up [for disorderly conduct] if she didn't stop her profanity." When two women at the end of the hallway "heard the commotion," they walked away down another hallway. When Polk reached the Hospital exit, she turned toward the officer and shouted, "[F]uck you, asshole," once again as she passed through the doors.

Now outside, Polk's continuing tirade at Corporal Sperl "startled" a group of ten or fifteen Hospital employees standing nearby. Corporal Sperl escorted Polk toward the Hospital parking garage. Polk was "very irate" and "was letting [Corporal] Sperl know how irate she was" by "yell[ing] at him and curs[ing] at him." At one point, Polk abruptly stopped walking, causing the officer to step on the back of one of her "flip-flop" sandals and almost lose his balance. When the "vulgarity . . . intensified," the Corporal announced that Polk was under arrest and attempted to apprehend her. He grabbed her shoulder, but she pulled away and bit his arm, breaking the skin on his wrist. During the scuffle, other security officers arrived and eventually subdued and arrested Polk.

Polk was charged with engaging in disorderly conduct in violation of Maryland Code, Article 27 § 121(b)(3) (1957, 1996 Repl.Vol., 2001 Supp.), resisting arrest, and second-degree assault in violation of Maryland Code, Article 27 § 12A (1957, 1996 Repl.Vol.).[2] She was tried before a jury in the Circuit Court for Wicomico County on 28 November 2001. After the State presented its case-in-chief, Polk moved for a judgment of acquittal as to all of the charges, arguing that Corporal Sperl's initial orders to "stop cursing" were unlawfully directed at the content of her speech and that a "domino effect" made her subsequent arrest illegal. She maintained that, by using profanity toward the officer, she was engaging in protected speech. According to Polk, because she had not disobeyed a lawful police order and the officer had no reason to arrest her, she rightfully resisted the attempts to arrest her.

The Circuit Court denied Polk's motion for acquittal. The judge concluded that Corporal Sperl's orders to "quiet down"

---

**2.** Section 12A provides that "[a] person may not commit an assault." Under Maryland Code, Art. 27 § 12, " 'assault' means the offenses of assault, battery, and assault and battery, which terms retain their judicially determined meanings." Section 12A has been recodified, without substantive change, at Md.Code (1974, 2002 Repl. Vol), § 3–203 of the Criminal Law Article, and Art. 27 § 12 has been recodified without substantive change at § 3–201 of the Criminal Law Article.

**6**

constituted lawful orders to prevent a disturbance to the public peace. The orders, in his view, were directed at the volume of Polk's speech rather than its content. In this regard, the judge stated:

"[T]here is the testimony of Corporal Sperl that Ms. Polk was irate, was using profane language, and I think it's reasonable to infer from his testimony that she was doing so loudly because he told her on several occasions that she had to be quiet and he told her that if she wasn't quiet that he would place her under arrest for disorderly conduct.

"There is testimony from Corporal Sperl that two other people who were in the hallway at the time changed their direction to walk away from where he and Ms. Polk were located, and it may be that they just don't like hearing someone say fuck you, asshole, but it could have also been because of the fact they didn't like the volume of the language, as well as the content.

"And because of that possibility, in looking at it in the light most favorable to the State, I think I have to assume at this point that they walked away for reasons other than merely the content of it.

"There is also testimony from Corporal Sperl and from other people who [observed the incident outside the hospital's exit doors] that Ms. Polk was out of control at the point when she exited the building, was speaking in a manner which I think could be considered loud, Sperl said that it caught everyone's attention in [that area] when they left."

From these findings, the judge concluded that a reasonable fact-finder could find that Polk failed to comply with the officer's orders to reduce the volume of her voice.

The jury found Polk guilty of disorderly conduct and resisting arrest, but acquitted her of the assault charge. The trial judge merged the two convictions and sentenced Polk to 18 months incarceration, suspending all but 60 days.

Polk appealed. The Court of Special Appeals affirmed the judgments in an unreported opinion. Before that court, Polk again argued that the officer's orders were directed unconsti-

tutionally at the content of her speech. The intermediate appellate court noted that the First Amendment to the U.S. Constitution "render[s] unlawful any order to refrain from profanity." Nonetheless, from the testimony that Polk was "irate," "yell[ing]," and "laps[ed] into . . . tirades of vulgarity," the court determined that she was "shouting when she cursed at [Corporal] Sperl." It determined, further, that the officer's orders to "keep [her] mouth quiet" sought to control the volume, rather than the content, of Polk's speech. Based on these determinations, the court concluded that a rational trier of fact could have found that "[Corporal] Sperl lawfully ordered [Polk] to quiet down, and that [she] ignored the order." Because Polk's challenge to the conviction for resisting arrest also was based on the illegality of the officer's orders the court held that, "that challenge must fail as well."

We granted Polk's petition for a writ of certiorari, *Polk v. State*, 372 Md. 429, 813 A.2d 257 (2002), to consider the following questions:

1. Does an officer's order to "stop cursing" and "stop [your] profanity" constitute a "lawful order" to the extent that an individual's refusal to comply would be a violation of Maryland Code, Article 27 § 121(b)(3)?

2. If such an order is not "lawful" for purposes of Article 27 § 121(b)(3), was the evidence sufficient to sustain the appellant's conviction for disorderly conduct?

For the reasons explained below, we conclude that, Petitioner's framing of her issues notwithstanding, Corporal Sperl's orders directed toward the volume of Polk's voice were reasonable and lawful orders and the evidence indicating she failed to obey those orders was sufficient to support her convictions.

## II. Standard of Review

In *Moye v. State*, we recently reiterated the standard of review for evaluation of the sufficiency of the evidence underlying a criminal conviction as:

whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. We view the evidence in a light most favorable to the prosecution. We give "due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." Although our analysis does not involve a re-weighing of the evidence, we must determine whether the jury's verdict was supported by either direct or circumstantial evidence[.]

369 Md. 2, 12, 796 A.2d 821, 827 (2002) (Citations omitted). If the facts as found by the trier of fact are not clearly erroneous, our review of the application of the law to those facts, such as where impingement on an individual's constitutional rights may be in question, is *de novo*. *See Glover v. State,* 368 Md. 211, 220, 792 A.2d 1160, 1165 (2002) (reviewing *de novo* the lower court's judgment on a motion to dismiss for violation of the constitutional right to a speedy trial); *see also Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000) (stating that with regard to a Fourth Amendment question, "this Court makes an independent determination of whether the State has violated an individual's constitutional rights by applying the law to the facts"). When we perform an independent constitutional review, "[w]e do not engage in *de novo* fact-finding." *Cartnail,* 359 Md. at 282, 753 A.2d at 525. Instead, we defer to the trial court's factual findings unless clearly erroneous. *Glover,* 386 Md. at 221, 792 A.2d at 1166.

### III.

The First Amendment of the U.S. Constitution applies to state and local governments through the Fourteenth Amendment. *Eanes v. State,* 318 Md. 436, 445, 569 A.2d 604, 609 (1990), citing *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).[3] Though the U.S. Constitution

---

**3.** It is not clear whether Corporal Sperl, a state-commissioned special police officer employed by Peninsula Regional Medical Center, is a state actor for the purposes of the Fourteenth Amendment, but this issue is

protects individuals from state regulation of speech, it is undisputed that "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he [or she] pleases, or to use any form of address in any circumstances that he [or she] chooses." *Eanes,* 318 Md. at 446, 569 A.2d at 608–609 (quoting *Cohen v. California,* 403 U.S. 15, 19, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284, 290 (1971)).

In arguing for reversal, Polk relies heavily on *Diehl v. State,* 294 Md. 466, 451 A.2d 115 (1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363(1983). In *Diehl,* the defendant, an automobile passenger, was convicted for disorderly conduct under a former version of § 121 after the driver was pulled over in a grocery store parking lot for a traffic violation. *Diehl,* 294 Md. at 467–69, 451 A.2d at 116–117. The statute prohibited "wilfully disturb[ing] any neighborhood in [any Maryland] city, town or county by loud and unseemly noises, or [] profanely curs[ing] or swear[ing] or us[ing] obscene language upon or near to any [] street or highway within the hearing of persons passing by or along such highway...." Art. 27, § 121 (1957, 1976 Repl.Vol.). Diehl refused to obey a police officer's order that he return to the car and stated: "Fuck you, [officer];" "I know my rights;" and "you can't tell me what to do." *Id.* at 468, 451 A.2d at 116. In response, the officer arrested Diehl for "screaming obscenities and ... drawing a crowd" while protesting the officer's order. *Id.* at 468, 451 A.2d at 117. We reversed Diehl's conviction for disorderly conduct because Diehl never acted unlawfully. We concluded that "where, as here, a person is acting in a lawful manner (a passenger getting out of a stopped car) and is the object of an unlawful police order [to return to the car], it is not usually a criminal violation for such person to verbally

---

not relevant to this case. A conviction for violating § 121(b)(3) is predicated on the "law enforcement officer" issuing a "reasonable and lawful order." An order that violates the First Amendment is no more reasonable or lawful if it is issued by a private police officer than if it is issued by a law enforcement officer employed by the State or a local governmental entity.

protest a police officer's insistence upon submission to such an order." *Id.* at 479, 451 A.2d at 122. Because Diehl was protesting an unlawful order, any disturbance created by Diehl's protests did not constitute disorderly conduct. *Id.* at 478, 451 A.2d at 122.[4]

*Diehl* subsequently was qualified by our holding in *Eanes v. State*, where we affirmed the defendant's conviction for disorderly conduct under § 121(b)(5)[5] for shouting loudly in front of an abortion clinic in a residential neighborhood. *Eanes*, 318 Md. 436, 468, 569 A.2d 604, 620 (1990). In *Eanes*, we stated:

---

**4.** It is not at all clear that, on its facts, *Diehl* would be decided today as it was in 1982. The *Diehl* majority observed that Officer Gavin "did not have any right to make his demand on Diehl" that Diehl re-enter the vehicle following the traffic stop. 294 Md. at 471, 451 A.2d at 118. In classifying Diehl's response as protected speech, the majority's analysis depended to a great extent on the conclusion that the officer's conduct in ordering Diehl back into the car was "unlawful," *id.*, constituted "police misconduct," *id.*, and "exceed[ed] the bounds of [the officer's] authority," *id.* at 478, 451 A.2d at 122. That this conclusion was important to the *Diehl* majority's reasoning is manifest from its statement:

> We conclude, therefore, that where, as here a person is acting in a lawful manner (a passenger getting out of a stopped car) and is the object of an unlawful police order, it is not usually a criminal violation for such person to verbally protest a police officer's insistence upon submission to such an order. We hold that the State failed to make out a *prima facie* showing of a violation of § 121 and, therefore, the trial judge erred in not granting Diehl's motion for a judgment of acquittal at the conclusion of the State's case or at the close of all the evidence.

294 Md. at 479, 451 A.2d 122 (citation omitted).

Today there is no question as to the lawfulness *vel non* of an officer's order, following a traffic stop, to the passenger of the stopped vehicle either to remain in or exit the vehicle. *See, Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (holding that the rule of *Pennsylvania v. Mimms*, that while making a traffic stop a police officer constitutionally may require a motorist to get out of the car, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), extends to passengers as well). For this reason, a major premise of the *Diehl* majority's analysis no longer is valid.

**5.** Eanes was convicted under another version of the former § 121(b)(5) for "wilfully disturb[ing] any neighborhood in [Maryland] by loud and unseemly noises ..." Md.Code, Art. 27 § 121(b)(5)(iii) (1957, 1987 Repl.Vol). This version contained similar language to that version of § 121 for which Diehl had been convicted.

"[As Justice Harlan, writing for the Supreme Court in Cohen, explained:][T]his Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue.... The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner."

\* \* \* \* \* \*

"Moreover, a captive audience that is entitled to protection may exist outside the home. Because riders on public rapid transit vehicles are captive audiences, a municipality may decline to accept political advertising on these vehicles. *Lehman* [*v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 2718, 41 L.Ed.2d 770, 778 (1974)]. *See also Grayned v. Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (ordinance prohibiting disturbance of school).

"The principle is grounded on the concept of privacy. "The Supreme Court permits the state to protect listeners who are 'captive' to unwanted speech—when speech invades their privacy interest in an essentially intolerable manner." Note, *Too Close For Comfort: Protesting Outside Medical Faculties*, 101 Harv.L.Rev. 1856, 1863 (1988) [footnote omitted]. Although that protection is most often extended to those within their homes, *it may be extended to any situation in which "privacy interests [are] substantially threatened" because "individuals cannot escape 'bombardment of [their] sensibilities.'" Id. at 1864* (quoting *Erznoznik* [*v.City of Jacksonville*, 422 U.S. [205,] 211, 95 S.Ct. [2268,] 2273, 45 L.Ed.2d [125,] 132 [ (1975) ], quoting *Cohen*, 403 U.S. at 21, 91 S.Ct. at 1786, 29 L.Ed.2d at 292). *See also* Comment, *'I'll Defend to the Death Your Right to Say It . . . But Not to Me'—The Captive Audience Corollary to the First Amendment*, 1983 S.Ill.U.L.J. 211, 215–216.

"Sound is one of the most intrusive means of communication. The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it. The cases support the view that content-neutral regulations controlling its loudness are permissible. It may be otherwise outside the home or office, where the audience is ordinarily not captive. But § 121 prohibits only that volume level of communication that unreasonably disturbs individuals whose rights to be free from aural abuse override the right of a speaker to address them by direct or incidental oral communication. This is the type of balance of conflicting interests contemplated by first amendment jurisprudence."

*Eanes,* 318 Md. at 451–53, 569 A.2d at 611–12 (some citations omitted) (some emphasis added).

■ In *Eanes,* we set forth the factors to be weighed in determining whether a regulation of speech is constitutional. Those factors include: (1) whether the regulation is content-based or content-neutral; (2) the circumstances surrounding the time and place where the speech occurred, as well as the overhearing parties' location; and (3) whether there are less disruptive alternatives available to the speaker.[6] *Eanes,* 318 Md. at 447, 454–56, 569 A.2d at 609, 613. Under *Eanes,* an order, such as Corporal Sperl's to "keep your mouth quiet," may be legitimate even if it results in a restriction on otherwise protected speech, if the three-pronged test is satisfied. *See, e.g., Briggs v. State,* 90 Md.App. 60, 71, 73, 599 A.2d 1221, 1226, 1227 (1992) (upholding the defendant's arrest for disorderly conduct because of his loud and disruptive behavior, despite the fact that his speech was protected under the First Amendment).

---

6. In *Eanes,* we stated that "the mechanical or electronic amplification of sound" may be another factor in the balancing test, 318 Md. at 456, 569 A.2d at 614, but noted that unamplified sound may still violate the statute: "[i]f the State is able to prove that, under the circumstances, the human voice is so unreasonably loud as to be unreasonably intrusive on a captive audience, that is enough." 318 Md. at 456–57, 569 A.2d at 614.

*Eanes* is clearly controlling here.[7]  *Diehl* is not applicable to, and is in fact distinguishable from, the facts of the case *sub judice.*  The Court in *Eanes* explained that the *Diehl* holding "is only applicable when the prohibition against 'loud and unseemly noise' seeks to regulate the *content* of speech." *Eanes,* 318 Md. at 444, 569 A.2d at 608 (emphasis added). The trial court in the present case applied the analysis approved in *Eanes* and found that (1) Corporal Sperl's orders, in the main, were content-neutral, (2) there was a sufficiently compelling state interest in protecting the rights of patients, visitors, and staff to be free from disturbances in a hospital setting, and (3) there were alternative means of expression available to Ms. Polk. Because there is sufficient evidence in the record of the present case supporting the trial court's findings that Corporal Sperl's orders, in the main, were content-neutral, the trial court's findings are not clearly erroneous and *Diehl* is inapposite.

Significantly, and unlike the present case, the arresting officer in *Diehl* testified that he arrested Diehl because of the *content* of his language.  *Diehl,* 294 Md. at 478, 451 A.2d at 122.  Corporal Sperl, on the other hand, did not testify that he arrested Polk based on the content of her language.  Instead, he stated that he told Polk "just shut your mouth and leave or you're going to be locked up for disorderly conduct."  This testimony supports the rational inference drawn by the trial court that the order was a lawful attempt to prevent Polk's violation of § 121 due to her loud and disruptive behavior.

The first factor of the *Eanes* test, whether the order was content-based or volume-based, must be considered in light of the appropriate standard of review.  As noted, *supra,* we must conduct a *de novo* review regarding any constitutional implications, but that analysis is informed by the trial court's findings of fact.  Thus, the issue before us is not whether Corporal

---

**7.** *Eanes* remains good law in Maryland, despite the announced views of some of the dissenters here. *See Galloway v. State,* 365 Md. 599, 614 n. 10, 781 A.2d 851, 859 n. 10 (2001), *cert. denied,* 535 U.S. 990, 122 S.Ct. 1547, 152 L.Ed.2d 472 (2002).

Sperl's orders were more likely content-based than content-neutral, but whether the trial court's factual determination was clearly erroneous that his orders, in the main, were directed at the volume of Polk's speech.

The Court of Special Appeals concluded that there was sufficient evidence in the record for a rational trier of fact to determine that Corporal Sperl's orders were directed at the volume of Polk's speech. The Court of Special Appeals stated:

> From the testimony of Sperl and Donohoe [a maintenance mechanic at Peninsula Regional Medical Center], the trier of fact could have inferred that appellant was shouting when she cursed at Sperl. Appellant's own testimony provided direct evidence that appellant was 'yelling' at Sperl. Appellant does not dispute that, if she was making enough noise to disturb other persons in the hospital, Sperl could have lawfully ordered her to be quiet. Indeed, § 121(b)(5)(ii) of Article 27 specifically states that "[a] person from any location may not by unreasonably loud noise willfully disturb the peace of another ... [i]n a place of business...." From Sperl's testimony, the trier of fact could have determined that Sperl ordered Appellant to quiet down.

■ The record contains ample testimony before the trial court supporting its finding that Corporal Sperl issued orders aimed, in the main, at the volume of Ms. Polk's speech. Corporal Sperl testified that, when Polk first cursed at him outside the Human Resources Department, he told her to "keep [her] mouth quiet and leave." In addition, he warned her "four or five times" thereafter to "keep [her] mouth quiet" as her tirade continued. Several witnesses confirmed his testimony regarding both Polk's conduct and his response. Polk was described as "screaming" to the employees of the Human Resources Division, "tell him to give me my check, tell him to give me my check." Brandon Donohoe, who witnessed the incident from an outdoors smoking area, described Polk as "very irate" and testified that she continually "lapse[d] into ... tirade[s] of vulgarity." Polk herself admitted that, as she and Corporal Sperl walked out the doors of the Hospital, she

"was so happy to be outside [she] did just, you know, yell at him and curse him." She further acknowledged that it was not until after she began yelling that the Corporal placed her under arrest. Charles Landherr, supervisor for facilities management at the hospital, testified that "[Corporal Sperl] was a little winded, but he was very calm. I thought he handled himself very professionally. He didn't use any foul language, and he was just trying to get Rhonda [Polk] to cooperate, which she obviously did not. She was totally out of control when I went out there." The Human Resources manager at the hospital, Craig Koppenhaver, a witness to some of Polk's outbursts, testified that "I heard Officer Sperl at one point say something to the effect, you're going to have to calm down, otherwise I'm going to have to place you under arrest." Each of these statements may be understood to mean that Corporal Sperl was attempting to do his duty to "maintain peace and order in the hospital."

The trial judge noted that the evidence would support a rational inference that Ms. Polk's unreasonable volume and disorderliness prompted her arrest, stating:

[t]here is testimony from Corporal Sperl that two other people who were in the hallway at the time changed their direction to walk away from where he and Ms. Polk were located, and it may be that they just don't like hearing someone say fuck you, asshole, but it could have also been because of the fact they didn't like the volume of the language, as well as the content ... And because of that possibility, in looking at it in a light most favorable to the State, I think I have to assume at this point that they walked away for reasons other than merely the content of it.

The dissent attempts to rewrite this Court's First Amendment jurisprudence announced in *Eanes*. The dissenting opinion states:

"An examination of the entire record reveals that Corporal Sperl's orders unlawfully attempted to regulate Polk's protected speech. First and foremost, the officer told Polk to "stop her profanity" and "stop her cursing." These com-

mands unquestionably were aimed at controlling the words Polk used and not the volume of her voice. Although the record indicates that Polk also was instructed to "keep your mouth shut" and "keep you mouth quiet," these phrases were always used in conjunction with the references to the content of Polk's speech. Where an officer issues orders that attempt to restrict protected speech, those orders are "content-based" and must be narrowly drawn to achieve a compelling state interest. *See Eanes,* 318 Md. at 447, 569 A.2d at 609 (quoting *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804 (1983)). This is so even if the "content-based" orders are combined, as they were here, with other commands that, by themselves, might not raise constitutional concerns.

(Dissent at 34).

Such a broad claim is insupportable under *Eanes,* a case which repeatedly emphasized that "[e]ven protected speech is not equally permissible in all places and at all times." *Eanes,* 318 Md. at 446, 569 A.2d at 609 (citation omitted). Each case the dissent uses to support its sweeping statement involves a facial constitutional challenge to a statute and therefore is inapposite to the case at hand. Polk does not challenge § 121 as unconstitutional on its face.

"[I]t is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression." *Thornhill v. Alabama,* 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093, 1100 (1940). *See also Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (statute properly subject to facial attack); *Termiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) likewise. A facial challenge to § 121 would fail almost certainly because the statute is much more limited than the Kentucky statute upheld in *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), for. example. *Compare* § 121(b)(3) ("[a] person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a

disturbance to the public peace") *with* Ky.Rev.Stat. § 437.016(1)(f) (Supp.1968) ("[a] person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... [c]ongregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse") (quoted in *Colten,* 407 U.S. at 108, 92 S.Ct. at 1956, 32 L.Ed.2d at 589). In the few cases where the Supreme Court has looked beyond the text of a valid statute to assess the "accusation or evidence under it," the Court has limited its inquiry to the sufficiency of the evidence. *See, e.g. Shuttlesworth v. Birmingham,* 382 U.S. 87, 95, 86 S.Ct. 211, 216, 15 L.Ed.2d 176, 182 (1965) ("[t]here was ... no evidence whatever in the record to support the petitioner's conviction under this ordinance"), *Cantwell v. Connecticut,* 310 U.S. 296, 311, 60 S.Ct. 900, 906, 84 L.Ed. 1213, 1221 (1940) ("the petitioner's communication ... raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question"). As demonstrated *supra,* the evidence in the present case is sufficient to support the convictions.[8]

The dissent not only ignores impermissibly the clearly erroneous standard and our precedents, but cherry-picks the evidence to support its view that Corporal Sperl's orders were directed at the content of Polk's speech. The dissent states that:

[a]n examination of the record reveals that Corporal Sperl's orders unlawfully attempted to regulate Polk's protected

---

**8.** The dissent appears to adopt a "fruit of the poisonous tree" approach based on drawing a factual inference from some of the earlier of Corporal Sperl's orders and electing to carry over the perceived taint from that inference onto all of his orders. ("The orders required Polk to 'stop her cursing,' 'stop her profanity,' 'keep [her] mouth quiet.' The collective effect of these prohibitions embraced not only the volume of Polk's voice, but also the content of her message.") (Dissent at 38). To adopt such an analytical model could lead to even more faulty and sweeping conclusions if applied in other cases calling for the assessment of the legal effect of a series of orders issued by law enforcement officers in similar circumstances or other dynamic situations.

speech. First and foremost, the officer told Polk to "stop her profanity" and "stop her cursing." These commands unquestionably were aimed at controlling the words Polk used and not the volume of her voice.

(Dissent at 34). To the contrary, upon close examination of the record, the facts are not nearly as "unquestionable" as the dissent portrays. Sperl testified that his *first* response to Polk's outburst of "fuck you, asshole," which occurred inside the hospital, was to request Polk to lower the *volume* of her voice:

> I said just *keep your mouth quiet* and leave. Again [she said] fuck you asshole. I said I feel sorry for your child, she had a child with her. After I said I feel sorry for your child, she said fuck you, asshole. I said *keep your mouth quiet* and leave or I'm going to lock you up for disorderly conduct."

(emphasis added).

Quixotically, the dissenting opinion points directly to facts it claims do not exist, and thus exposes its own error, by observing that:

> [t]he majority makes a significant effort to highlight the volume of Polk's speech. It pinpoints the testimony describing Polk's behavior as 'screaming,'
> 'tirades of vulgarity,' 'yelling,' and 'loud.' The emphasis on the actual volume of Polk's speech, however, is only a diversion from the consequential issue.

(Dissent at 40). To the contrary, because it has been determined *by the trial court* that Corporal Sperl's orders were directed at the volume of Ms. Polk's voice, her volume is not a diversion, but is rather the consequential issue.

The second factor in the *Eanes* analysis requires an examination of both the time and place of the speech and the overhearing parties' location. *Eanes*, 318 Md. at 455–56, 569 A.2d at 613. The physical circumstances surrounding an outburst influence the legality of a restriction on speech. In *Eanes*, we emphasized that because "the character of open public places may differ widely, one from another, only a

flexible approach to volume control can adequately serve the myriad circumstances which the state can legitimately regulate." 318 Md. at 454, 569 A.2d at 613. The restriction on speech in *Eanes* was permissible under the First Amendment because Eanes's speech took place in a residential area, affecting a "captive audience," who we defined as "unwilling listener[s] or viewer[s] who cannot readily escape from the undesired communication, or whose rights are such that [they] should not be required to do so." *Eanes*, 318 Md. at 451, 569 A.2d at 611.

*Eanes* did not limit its holding to residential areas. Significantly, we noted that "[protection from unwanted speech] may be extended to any situation in which privacy interests [are] substantially threatened because individuals cannot escape bombardment of [their] sensibilities." *Eanes*, 318 Md. at 452–53, 569 A.2d at 612 (alterations in original) (citations omitted). Hospitals and their immediate environs, in particular, share with residential areas a similarly heightened need for protection. As we pointed out in *Eanes*, "[a] sound level that a pedestrian on the sidewalk could not constitutionally object to might be impermissible with respect to a patient in an intensive care ward." 318 Md. at 456, 569 A.2d at 613.

Similarly, in *Radford v. State*, 640 N.E.2d 90, 93 (Ind.Ct. App.1994), the Court of Appeals of Indiana recognized the compelling state interest in protecting its citizens from unwelcome disturbances at a hospital. The *Radford* court initially overturned Radford's conviction for disorderly conduct for refusing to obey an officer's lawful order to quiet down. *Radford v. State*, 627 N.E.2d 1331 (Ind.Ct.App.1994). The court then reversed itself, on rehearing, quoting from the original dissent:

Radford's abusive and harmful speech invaded the privacy of those patients in the hospital and destroyed their right to a quiet and peaceful environment. Patients with heart conditions and patients with nervous disorders, among others, come to the hospital expecting quietude. The intrusiveness, harm, and abuse in Radford's forum is a thousand times more sensitive than the forum [of a disorderly conduct

case occurring in]—a residential alley at 3:00 in the morning.

*Id.* We agree with the reasoning of the *Radford* court and conclude here that Corporal Sperl had a compelling interest in maintaining peace and quiet in the environs of the Hospital.

The dissenting opinion in the present case claims *Radford* is "easily distinguishable" from the facts of the present case. The dissent is wrong. First, it states that while the officer in *Radford* never addressed the content of Radford's speech, Corporal Sperl sought to regulate the content of Polk's speech. (Dissent at 39). Again, this is a factual determination for which an appellate court cannot substitute its own finding for that of the trial court. As our analysis *supra* reveals, the trial judge's factual findings were not clearly erroneous in this regard. Second, the dissent states that while the disruptive outburst in *Radford* occurred inside the hospital, Polk's outbursts occurred near the Human Resources office and "reached its pinnacle" outside the actual hospital building. (Dissent at 39). Consequently, the dissent intimates that there is no legitimate interest in protecting hospital patients, visitors, or workers from disturbances under these circumstances. *Id.* In fact, Corporal Sperl initiated Polk's arrest *as she was leaving* the building, not after she exited. Furthermore, Polk's location at the time of her arrest is irrelevant to the central question, whether she acted in a disorderly manner in and around the Hospital. The evidence shows that Polk acted in a disorderly manner while inside the Hospital, well before she was arrested. Thus, Corporal Sperl was legally entitled to arrest Polk for creating a disturbance in the Hospital, a situation identical to that in *Radford.*

The third prong in the *Eanes* test is whether there are alternative means of communication available to the speaker. In *Eanes,* we stated that "a speaker will usually have a number of less noisy ways of presenting his or her message: speaking at lower volume; individual contact; use of placards or leaflets. So the balance of reasonableness may rest differently depending on the circumstances." 318 Md. at 456, 569

A.2d at 614. As in *Eanes*, Polk had other ways of expressing her discontent with the hospital and/or Corporal Sperl, such as speaking to a supervisor in Human Resources, writing a letter to the hospital stating her complaints, or speaking to Corporal Sperl's supervisor.[9]

■ For the foregoing reasons, the trial court correctly found that Corporal Sperl's orders were lawful under § 121(b)(3). This Court, therefore, agrees with the Court of Special Appeals that "because appellant's challenge to her conviction for resisting arrest is based on the faulty premise that her arrest for disorderly conduct was unlawful, that challenge must fail as well." Because the trial court's findings of fact were not clearly erroneous, Polk's convictions for disorderly conduct and resisting arrest are affirmed.

*JUDGMENTS AFFIRMED, WITH COSTS.*

Dissenting Opinion by BATTAGLIA, Judge.

I respectfully dissent. The majority inappropriately accords deference to a trial court's determination of a constitutional fact. When that determination is reviewed under the appropriate standard, however, serious First Amendment infringements become apparent, and the majority's conclusions crumble.

## I.

The focus of the analysis in this case should be on the orders issued by Corporal Sperl. Although the crime of disorderly conduct can take several forms under Section 121, the jury, in this case, convicted Polk of violating Section 121(b)(3), which declares that "[a] person may not willfully fail to obey a reasonable and lawful order of a law enforcement

---

9. If Polk had maintained the same content of her speech, but changed the manner of its expression—if she had lowered her voice, but continued cursing—she could not have been convicted of disorderly conduct. Likewise, if she had changed the content of her expression, without changing its manner—if she had continued shouting in and about the Hospital, but without cursing—she still could have been convicted.

officer made to prevent a disturbance of the public peace." As the plain language of this provision makes clear, no violation of Section 121(b)(3) can occur unless the officer first gave an order that was "lawful." This aspect of lawfulness is the essence of Polk's case.

In granting Polk's petition for a writ of certiorari, this Court sought to resolve the important constitutional question of whether Corporal Sperl issued unlawful orders that infringed on Polk's First Amendment rights. The answer to this question requires a careful analysis of whether the particular police commands used by Corporal Sperl regulated the content or volume of Polk's speech. The majority characterizes this pivotal constitutional question as a factual one, stating, "the issue before us is not whether Corporal Sperl's orders were more likely content-based than content neutral, but whether the trial court's factual determination was clearly erroneous that his orders, in the main, were directed at the volume of Polk's speech." Majority at 13–14. This analysis demonstrates the majority's misunderstanding of the standard of review required in First Amendment cases. The Court should have rendered an independent review of the whole record in this case because the Supreme Court requires such independent appellate review where factual findings implicate First Amendment freedoms.

It is well-established that the Court undertakes an independent constitutional appraisal of a trial court's determination of whether one's First Amendment right to free speech has been infringed. *See Crosby v. State*, 366 Md. 518, 526, 784 A.2d 1102, 1106 (2001) (stating that "when the issue is whether a constitutional right has been infringed, we make our own independent constitutional appraisal") (citing *Stokes v. State*, 362 Md. 407, 414, 765 A.2d 612, 615 (2001)). In cases that do not raise First Amendment issues, the Court ordinarily accepts the trial court's findings of fact unless those findings are clearly erroneous. *See Glover v. State*, 368 Md. 211, 221, 792 A.2d 1160, 1166 (2002) (applying *de novo* review to a question of the constitutional right to a speedy trial but stating that the trial court's findings of fact are reviewed under a clearly

erroneous standard) (citing *Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879, 883 (2001)). In First Amendment cases, however, the Court does not defer to fact findings that have constitutional implications; rather, the Court independently examines the " 'whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502, 515 (1984) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–86, 84 S.Ct. 710, 727–29, 11 L.Ed.2d 686, 709 (1964)).

The Supreme Court discussed this distinct aspect of appellate review of First Amendment cases in *Bose,* 466 U.S. at 498–515, 104 S.Ct. at 1958–67, 80 L.Ed.2d at 515–26. There, in an opinion prepared by Justice Stevens, the Court reconciled Federal Rule of Civil Procedure 52(a), which subjects findings of fact to "clearly erroneous" review, and the requirement in First Amendment cases that an appellate court has an obligation to make an independent examination of the whole record. The trial court, sitting without a jury, had determined, under *New York Times Co. v. Sullivan,*[1] that there was clear and convincing evidence that a consumer magazine made a false disparaging statement with "actual malice" in a published evaluation of a Bose brand speaker. *Id.* at 490–91, 104 S.Ct. at 1954, 80 L.Ed.2d at 510. Without deferring to the trial court, the United States Court of Appeals reviewed the determination and reversed. Bose argued before the Supreme Court that the determination of "actual malice" amounted to a factual finding, which according to FRCP 52(a), must be upheld unless clearly erroneous. The Supreme Court disagreed, holding that "the clearly-erroneous standard of [FRCP 52(a) ] does not prescribe the standard of review to be applied in reviewing a determination of actual malice . . . ." *Id.* at 514, 104 S.Ct. at 1967, 80 L.Ed.2d at 525–26.

---

1. In *New York Times v. Sullivan,* the Supreme Court established the requirement for a finding of "actual malice" in certain types of defamation actions. 376 U.S. at 285, 84 S.Ct. at 727, 11 L.Ed.2d at 708.

The Court in *Bose* presented several reasons why a determination of "actual malice" in defamation cases required such close appellate overview:

First, the common-law heritage of the rule itself assigns an especially broad role to the judge in applying it to specific factual situations. Second, the content of the rule is not revealed simply by its literal text, but rather is given meaning through the evolutionary process of common-law adjudication; though the source of the rule is found in the Constitution, it is nevertheless largely a judge-made rule of law. Finally, the constitutional values protected by the rule make it imperative that judges—and in some cases judges of this Court—make sure that it is correctly applied.

*Id.* at 502, 104 S.Ct. at 1960, 80 L.Ed.2d at 517.

Speaking of the second of these reasons, the *Bose* Court explained that, "[w]hen the standard governing the decision of a particular case is provided by the Constitution, [the] Court's role in marking out the limits of the standard through the process of case-by-case adjudication is of special importance." *Id.* at 503, 104 S.Ct. at 1961, 80 L.Ed.2d at 518. The Court stated that "[t]his process has been vitally important in cases involving restrictions on the freedom of speech protected by the First Amendment, particularly in those cases in which it is contended that the communication in issue is within one of the few classes of 'unprotected' speech." *Id.* Determinations of what constitutes libelous speech, fighting words, incitement to riot, obscenity, and child pornography all involved the "evaluation of special facts that have been deemed to have constitutional significance." *Id.* at 504–05, 104 S.Ct. at 1961–62, 80 L.Ed.2d at 519 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (fighting words); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (incitement to riot); *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity); *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (child pornography)). Specifically, questions of what appeals to the "prurient interest" and what is "patently offensive," the Court described, are "essentially questions of fact"

yet subject to an appellate court's "ultimate power ... to conduct an independent review of constitutional claims...." *Id.* at 506, 104 S.Ct. at 1963, 80 L.Ed.2d at 520 (quoting *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973)). Whenever the Court has considered the limits of unprotected speech, it:

> has regularly conducted an independent review of the record both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited. Providing triers of fact with a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit the expressions of protected ideas. The principle of viewpoint neutrality that underlies the First Amendment itself ... imposes a special responsibility on judges whenever it is claimed that a particular communication is unprotected.

*Id.* at 505, 104 S.Ct. at 1962, 80 L.Ed.2d at 519–20 (citation omitted).

Expounding on constitutional significance of the "actual malice" determination, the *Bose* Court provided insight into why constitutional claims, and First Amendment claims in particular, deserve the close appellate attention of independent review:

> The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage. It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a ques-

tion for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Id.* at 510–11, 104 S.Ct. at 1965, 80 L.Ed.2d at 523.

Several commentators analyzing *Bose* have illustrated the difference between those "findings" best accorded deference and those the Supreme Court has held should be reviewed independently based on the whole record. Purely factual findings worthy of deference, as one commentator suggests, answer questions that *"can be determined by direct observation* and by accepting or rejecting the testimony of witnesses who are reporting their own direct observations." George C. Christie, *Judicial Review of Findings of Fact,* 87 Nw. U.L.Rev. 14, 39 (1992) (hereinafter "Christie") (emphasis added). Other scholars explain that the process of establishing "facts" involves answering "who, when, what, and where," inquiries that "can be made by a person who is ignorant of the applicable law." Henry P. Monaghan, *Constitutional Fact Review,* 85 Colum. L.Rev. 229, 235 (1985) (hereinafter "Monaghan")(quoting, in part, L. Jaffe, *Judicial Control of Administrative Action* 548, 624–53 (1965).

On the other hand, some "factual findings" cannot be made by direct observation alone, but also "require some degree of conscious reflection." Christie at 40. When such reflection is necessary, one must resolve "why it is necessary to decide the question and what will be the consequences of deciding the question one way or the other." *Id.* at 39–40. Commentators have described the process of making determinations of this nature as "law application" or answering "mixed questions of law and fact." *See* Monaghan at 236; Christie at 39. Law application occurs frequently in areas outside of the First Amendment context, such as when a jury decides whether a defendant in tort case was negligent. When constitutional rights are not at stake, appellate courts typically review these judgments with some degree of deference.

The Supreme Court mandates, however, that where "law application" implicates First Amendment freedoms, appellate courts should not defer to the trial court's judgment. Rather, the appellate court "has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose*, 466 U.S. at 499, 104 S.Ct. at 1958, 80 L.Ed.2d at 515 (quoting *New York Times Co.*, 376 U.S. at 284–86, 84 S.Ct. at 728–29, 11 L.Ed.2d at 708–09). Sometimes referred to as "constitutional fact" review, the requirement of rendering an independent determination of First Amendment law application ensures, as the *Bose* Court recognized, that the appellate courts, on a case by case basis, develop the meaning of the constitutional principles at issue. Commentators consider this a form of norm elaboration. Monaghan at 231. That is, an appellate court's case-by-case filtering of specific facts through First Amendment principles serves to assign practical significance to those principles. Without reference to specific facts, First Amendment standards are merely abstract principles. As Professor Monoghan summarized:

> Constitutional fact review presupposes that appellate courts will render independent judgment on any issues of constitutional "law" presented. Its distinctive feature is a requirement of similar independent judicial judgment on issues of constitutional law "application." That is, the courts must sort out the relevant facts and apply to them the controlling constitutional norms.

Monaghan at 238.

First Amendment issues are no less apparent in the case at bar than they were in *Bose*. Corporal Sperl issued orders seeking to control Polk's speech. Whether those orders were directed at her volume, as the trial court found, or directed at her message, they must survive First Amendment scrutiny. This determination, though, dictates the level of scrutiny we apply to those orders, and, to a great extent, the lawfulness of those orders; it is inextricably tied to whether Polk's speech was protected by the First Amendment. Only by conducting

an independent review of Polk's case based on the entire record may this Court set the limits of what types of speech are protected under the First Amendment. This Court's duty to declare the meaning of the First Amendment cannot be delegated to the trier of fact. The freedoms enjoyed under the First Amendment are simply too precious to risk a trial court's mistaken interpretation of how a police officer may control an individual's speech.

Moreover, the trial court's judgment that Corporal Sperl directed his orders at the volume of Polk's speech rather than its content was not the type of factual finding to which an appellate court accords deference. *See Wells v. City and County of Denver,* 257 F.3d 1132, 1146–47 (10th Cir.2001) (citing *Bose* and reviewing a determination of content-neutrality independently based on the whole record); *AIDS Action Comm. v. Massachusetts Bay Transp. Auth.,* 42 F.3d 1, 7–8 (1st Cir.1994) (reviewing the entire record independently to determine whether a government restriction was a content-based or content-neutral); *see also Pack Shack, Inc. v. Howard County,* 377 Md. 55, 71, 832 A.2d 170, 180 (2003) (considering the question of content-neutrality without regard to the trial court's finding on that matter).

The State presented evidence at trial that Corporal Sperl had issued a series of commands to Polk as she was leaving the hospital. Corporal Sperl, himself, testified that he commanded Polk to "stop her cursing," "stop her profanity," "keep [her] mouth quiet," and "keep [her] mouth shut." The State did not contend that the officer's testimony misstated the words he used in issuing the orders to Polk, nor did the State dispute that Corporal Sperl referred specifically to Polk's profanity in those orders. Because no conviction under Section 121(b) may rest on an unlawful police order, the trial judge had an obligation, upon Polk's motion for judgment of acquittal, to decide the lawfulness of police orders that sought to restrict both the content and volume of an individual's speech.

To answer this question properly, the judge could not merely rely on direct observation of the testimony, which might allow him to decide the time and place the incident occurred or the words Corporal Sperl used to issue his commands. Instead, the process of making this determination involved examining First Amendment law to decide whether it permitted mixed regulation of speech content and volume. The Supreme Court in *Bose* directed that this type of analytical process must be subjected to independent review of the appellate court. Because Polk's First Amendment rights were implicated by the trial court's finding, the Court should not be bound by the clearly erroneous standard of review. The majority should have employed a *de novo* review of this case to answer the constitutional question of whether the orders given by Corporal Sperl were directed at the volume or content of Polk's speech.

## II.

By deciding that Corporal Sperl directed his orders at the volume of Polk's voice, the trial judge misapplied an established First Amendment principle to the facts of this case. The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." This command, by operation of the Fourteenth Amendment, applies with equal force to state and local governments. *Eanes v. State,* 318 Md. 436, 445, 569 A.2d 604, 608 (1990) (citing *Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)). Without question, however, "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he chooses." *Id.* at 446, 569 A.2d at 608–09 (quoting *Cohen v. California,* 403 U.S. 15, 19, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284, 290 (1971)); *see also R.A.V. v. St. Paul,* 505 U.S. 377, 382–83, 112 S.Ct. 2538, 2542–43, 120 L.Ed.2d 305, 317 (1992) (discussing the restrictions on speech that are permissible under the First Amendment). For example, consistent with the First Amendment, States may restrict the use of "fighting words," *Chap-*

*linsky,* 315 U.S. at 571–72, 62 S.Ct. at 769, 86 L.Ed. at 1035, and in a limited way, restrict the use of "obscenity," *see Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and defamatory speech, *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Beauharnais v. Illinois,* 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952).

Nevertheless, as the Supreme Court's and our cases make clear, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 818, 120 S.Ct. 1878, 1889, 146 L.Ed.2d 865, 882 (2000). Rather, such regulation is prohibited unless it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . ." *Eanes,* 318 Md. at 447, 569 A.2d at 609 (quoting *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794, 804 (1983)); *see also Playboy,* 529 U.S. at 813, 120 S.Ct. at 1886, 146 L.Ed.2d at 879. Therefore, "[w]here the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists." *Playboy,* 529 U.S. at 813, 120 S.Ct. at 1886, 146 L.Ed.2d at 879.

Guided by these principles, this Court has held on two occasions that convictions for disorderly conduct based on the profane nature of one's speech run afoul of the First Amendment. *Diehl v. State,* 294 Md. 466, 470–74, 451 A.2d 115, 118–20 (1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983); *Downs v. State,* 278 Md. 610, 618, 366 A.2d 41, 46 (1976). In *Downs,* the Court addressed whether the uttering of "the fucking niggers in this county are no better than goddamn policemen" constituted protected speech. 278 Md. at 611, 366 A.2d at 42. Downs spoke these words in a loud voice while conversing with three friends over breakfast in a crowded restaurant. *Id.* Overhearing the vulgarity, a police officer approached Downs, told him that his talk was

disruptive, and warned that "if he did not refrain from using such profane language," he would arrest him. *Id.*, 366 A.2d at 42–43. When Downs foolishly replied, "You ain't bad enough to place me under arrest," the officer arrested him, and a jury later convicted him of several offenses, including disorderly conduct. *Id.* at 611–12, 366 A.2d at 43. The Court reversed the convictions, holding that "Downs' remarks were not the kind of personally abusive epithets which fall outside of the protection of the First Amendment under the rubric of 'fighting' words." *Id.* at 618, 366 A.2d at 46. Rather, the Court concluded, "He engaged in protected speech. That his views might be offensive to someone who overheard him does not warrant a conviction for disorderly conduct." *Id.*

The Court further developed this line of reasoning in *Diehl,* 294 Md. 466, 451 A.2d 115. There, a patrolling police officer pulled over a car for "squealing wheels." *Id.* at 467, 451 A.2d at 116. After both the driver and a passenger got out of the car, the officer ordered them to get back into the vehicle. The driver complied, but the passenger, Diehl, yelled at the officer, "Fuck you, Gavin;" "I know my rights;" "you can't tell me what to do...." *Id.* at 468, 451 A.2d at 116. The officer again ordered Diehl into the car, warning him that he would be arrested if he did not obey. *Id.* at 468, 451 A.2d at 117. When Diehl refused to follow the instructions, the officer arrested him for "screaming obscenities and ... drawing a crowd." *Id.* Diehl was convicted of numerous offenses, including violating former Article 27, Section 121, which prohibited "wilfully disturb[ing] any neighborhood in ... [any] city, town or county [of this State] by loud and unseemly noises, or ... profanely curs[ing] or swear[ing] or us[ing] obscene language upon or near to any street or highway within the hearing of persons passing by or along such highway." Following an appeal to the Court of Special Appeals, which affirmed the convictions, we issued a writ of certiorari and then reversed. *Id.* at 469, 451 A.2d at 117.

At the outset in *Diehl,* the Court noted that Diehl's "oral communication ... clearly constituted speech" and, therefore, was entitled to First Amendment protection. *Id.* at 471, 451

A.2d at 118. Significantly, we observed that *"Downs* . . . teaches us that the use of the word 'fuck' is not punishable in the absence of compelling reasons." *Id.* at 477, 451 A.2d at 122. Diehl's words, we concluded, although specifically directed at the police officer, did not qualify as "fighting words" because they were spoken, not as a "personally abusive epithet hurled to invoke immediate and violent response," but as an "emotional and emphatic response to [the officer's] order." *Id.* at 478, 451 A.2d at 122.

These cases demonstrate clearly that an order directed at controlling a speaker's use of profanity constitutes an impermissible content-based restriction on free speech. Indeed, the State does not dispute this axiom, stating in its brief that the "First Amendment would render unlawful, as constituting disorderly conduct, any order to refrain from profanity." The State also does not contend that Polk used "fighting words," conceivably because there is no evidence that her speech was intended "to invoke immediate and violent response," *Diehl,* 294 Md. at 478, 451 A.2d at 122, or because the words were spoken to a police officer who "may reasonably be expected to 'exercise a higher degree of restraint' than the average citizen and be less likely to respond belligerently . . . ." *Id.* at 477, 451 A.2d at 121 (quoting *Lewis v. City of New Orleans,* 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214, 220 (1974) (Powell, J., concurring)). Consequently, the content of Polk's speech, which included the same "profanity" at issue in *Downs* and *Diehl,* was protected under the First and Fourteenth Amendments.

The majority determines that Corporal Sperl's orders to Polk sought to restrict not the content of her speech, but its volume. Under the majority's view, the orders were permissible, "content-neutral" regulations to control unreasonably loud noise caused by Polk. In support of its assertions, the majority relies on this Court's decision in *Eanes v. State,* 318 Md. 436, 569 A.2d 604 (1990). The *Eanes* Court affirmed the conviction of an anti-abortion protester, whose loud preaching during the mid-morning hours in a busy downtown area constituted a "wilful[] disturb[ance] of any neighborhood . . . by loud and

unseemly noises" in violation of former Article 27, Section 121. *Id.* at 440–41, 468, 569 A.2d at 606, 620. Reading the statute's restriction on speech to be "clearly content-neutral," the Court subjected it to constitutional scrutiny to determine whether it was "narrowly tailored to serve a substantial governmental interest." *Id.* at 449, 569 A.2d at 610. "Sound," the *Eanes* Court explained, "is one of the most intrusive means of communication," and the "government ha[s] a substantial interest in protecting its citizens from unwelcome noise." *Id.* at 449, 453, 569 A.2d at 610, 612 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 796, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661, 678 (1989)). Because the statute "prohibit[ed] only that volume level of communication that unreasonably disturbs individuals whose rights to be free from aural abuse override the right of a speaker to address them by direct or incidental oral communication," it "serve[d] a substantial interest and [was] narrowly tailored to serve those ends." *Id.* at 453–54, 569 A.2d at 612. Based on the trial judge's findings that Eanes's speech was loud and actually disturbed residents and business people in the area, the Court concluded:

> [The trial judge] properly balanced Eanes's first amendment rights against a substantial public interest protected by a narrowly drawn, content-neutral regulation. Eanes was warned to lower his voice by a police officer whose action was based on complaints from members of the captive audience. Eanes chose not to comply. Under these circumstances, he was properly convicted of a violation of the statute.

*Id.* at 468, 569 A.2d at 620.[2]

The teachings of *Eanes, Diehl,* and *Downs,* expose the pivotal constitutional question in this case: whether Corporal

---

**2.** Judge Eldridge, in his dissenting opinion in *Eanes,* disagreed that the speech at issue in that case warranted a criminal conviction. 318 Md. at 500, 569 A.2d at 635 (Eldridge, J., dissenting). He believed, instead, that Eanes "was engaged in free speech in its 'most pristine and classic form' " at the time of his arrest. *Id.* at 472, 569 A.2d at 622 (quoting *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697, 702 (1963)). He also took the position that the majority,

Sperl's orders impermissibly restricted the content of Polk's speech. If the officer directed his orders to restrict the use of profanity, he issued a content-based order, which is unlawful unless it "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. . . ." *Eanes*, 318 Md. at 447, 569 A.2d at 609 (quoting *Perry Education Assn.*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804. On the other hand, if the commands were an attempt to regulate the volume of Polk's language, they may be able to withstand constitutional scrutiny under *Eanes* if they were "narrowly tailored to serve a substantial governmental interest." *Id.* at 449, 569 A.2d at 610.

An examination of the entire record reveals that Corporal Sperl's orders unlawfully attempted to regulate Polk's protected speech. First and foremost, the officer told Polk to "stop her profanity" and "stop her cursing." These commands unquestionably were aimed at controlling the words Polk used and not the volume of her voice. Although the record indicates that Polk also was instructed to "keep your mouth shut" and "keep your mouth quiet," these phrases were always used in conjunction with the references to the content of Polk's speech. Where an officer issues orders that attempt to restrict protected speech, those orders are "content-based" and must be narrowly drawn to achieve a compelling state interest. *See Eanes*, 318 Md. at 447, 569 A.2d at 609 (quoting *Perry Education Assn.*, 460 U.S. at 45, 103 S.Ct. at 955, 74 L.Ed.2d at 804).

This is so even if the "content-based" orders are combined, as they were here, with other commands that, by themselves, might not raise constitutional concerns. That is, despite Corporal Sperl's alleged attempt to quiet Polk's voice, it is his order to control her speech content that dictates which level of scrutiny this Court should apply. Support for this approach resides in the Supreme Court's longstanding prohibition of

by emphasizing the importance of volume control, "overlooked that sound, in the form of the spoken word, is the most basic thing protected by the First Amendment." *Id.* at 476, 569 A.2d at 624.

laws that "do[] not aim specifically at evils within the allowable area of [government] control, but ... sweep[] within [their] ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech...." *See Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093, 1100 (1940); *see also Secretary of State of Md. v. Joseph H. Munson Co. Inc.,* 467 U.S. 947, 967–68, 104 S.Ct. 2839, 2852–53, 81 L.Ed.2d 786, 802–03 (1984) ("Where, as here, a statute imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack."); *Terminiello v. Chicago,* 337 U.S. 1, 4–5, 69 S.Ct. 894, 895–96, 93 L.Ed. 1131, 1134–35 (1949) (invalidating under the First Amendment the application of a city code provision that the trial court had construed as prohibiting conduct, which "stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance," because the prohibited conduct, in part, encompassed protected speech); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 308–11, 60 S.Ct. 900, 903, 905–06, 84 L.Ed. 1213, 1215, 1220–21 (1940) (holding that the "general and undefined" common law offense of "inciting a breach of peace" was an unconstitutional proscription of a wide range of activities, some of which were protected by the First Amendment); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 1022 (2nd ed. 1988) ("A law is void on its face if it 'does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise' of protected expressive or associational rights.") (quoting *Thornhill,* 310 U.S. at 97, 60 S.Ct. at 742, 84 L.Ed. at 1100).[3]

---

**3.** Attempting to distinguish these cases, the majority points out that each one "involves a facial constitutional challenge to a statute." Because Polk did not challenge the facial validity of Section 121, the majority claims, the cases are "inapposite to the case at hand." Majority at 16. The distinction relied upon is without meaning. *Thornhill* and its progeny stand for the proposition that overly broad government

In *Thornhill,* the Supreme Court struck down an Alabama state statute, which prohibited all loitering or picketing around a place of business, on grounds that it violated the First Amendment. *Id.* at 104, 60 S.Ct. at 745, 84 L.Ed. at 1103. The Court concluded that, even though the statute prohibited conduct that the Constitution did not protect, such as violence and breaches of the peace, it also placed restrictions on "peaceful and truthful discussion of matters of public interest," activities that enjoy First Amendment protection. *Id.* Because the law did not "aim specifically" at the activities that States may regulate validly, it therefore constituted an unlawful, "sweeping proscription of freedom of discussion." *Id.* at 104, 105, 60 S.Ct. at 745, 746, 84 L.Ed. at 1103, 1104.

In *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the Court again held unconstitutional a statute that penalized a range of conduct that included certain protected speech. The Georgia statute at issue established criminal penalties for certain uses of "opprobrious words or abusive language, tending to cause a breach of the peace." *Id.* at 519, 92 S.Ct. at 1104, 31 L.Ed.2d at 412. The Court recognized that statutes touching on the constitutional guarantees of free speech "must be carefully drawn or authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Id.* at 522, 92 S.Ct. at 1106, 31 L.Ed. at 414. In light of this requirement, the Court concluded that the Georgia statute, as defined by the state courts, "d[id] not define the standard of responsibility with requisite narrow specificity." *Id.* at 527, 92 S.Ct. at 1108, 31 L.Ed.2d at 417. Although the statute did apply to "fighting words" (conduct for which the First Amendment offered no protection), its strictures also affected protected

---

speech regulation, whether in the form of enacted legislation or impromptu police orders, violates the First Amendment right to free speech. The substance of the government regulation, not its form or source, should drive the constitutional analysis. It is highly unlikely that the Supreme Court's analysis would turn on whether a police officer or legislative body acted to infringe upon one's constitutional right.

expression and, consequently, violated the First Amendment. *Id.* at 528, 92 S.Ct. at 1109, 31 L.Ed.2d at 417.

Very recently, in *Virginia v. Black,* 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (plurality opinion), the Supreme Court applied the principles expressed in *Gooding* to invalidate a provision of Virginia's statutory scheme, prohibiting cross-burning with the intent to intimidate. The provision at issue stated that "any such burning of a cross," established a prima facie case of an intent to intimidate. *Id.* at ——, 123 S.Ct. at 1550, 155 L.Ed.2d at 554. This language, therefore, rendered all cross-burning subject to criminal sanctions, including that which was intended as an expression of ideology not intimidation. By failing to distinguish between different types of cross-burning (i.e., those carried out with the intent to intimidate and those carried out as political expression), the prima facie provision penalized both protected as well as unprotected acts of expression. *Id.* at ——, 123 S.Ct. at 1151, 155 L.Ed.2d at 556. The Court held, therefore, that the prima facie evidence provision was "unconstitutional on its face." *Id.* at ——, 123 S.Ct. at 1151–52, 31 L.Ed.2d at 557.

Consistent with the spirit of these Supreme Court cases, Corporal Sperl's orders in this case do not pass constitutional scrutiny. The orders required Polk to "stop her cursing," "stop her profanity," "keep [her] mouth shut," and "keep [her] mouth quiet." The collective effect of these prohibitions embraced not only the volume of Polk's voice, but also the content of her message. The orders were not narrowly drawn to cover only the aspects of Polk's speech that were "content-neutral" and that the First Amendment allows to be regulated more freely. Rather, the orders were susceptible of application to "content-based" speech and, therefore, should be subjected to a stricter standard of constitutional scrutiny.

Under this stricter standard of First Amendment scrutiny, as we have previously discussed, the content of Polk's speech "is not punishable in the absence of compelling reasons." *Diehl,* 294 Md. at 477, 451 A.2d at 122 (citing *Downs,* 278 Md. at 618, 366 A.2d at 46). Like in *Diehl,* where the motorist

uttered "vulgar language" at a police officer, there are no compelling reasons in this case that warranted Corporal Sperl's proscription of Polk's choice of language. *See id.* at 478, 451 A.2d at 122. No evidence in the record suggests that the conditions in and around the hospital necessitated completely prohibiting the use of vulgar language. In the absence of compelling reasons to forbid Polk's use of certain words, Corporal Sperl had no lawful justification for issuing orders to "stop her cursing" and "stop her profanity."

Nevertheless, the majority insists on reaching a different result in this case because the alleged conduct took place within a hospital, which has a particular interest in avoiding unreasonably loud noises. As support for this assertion, the majority points to the decision of an Indiana intermediate appellate court in *Radford v. State*, 640 N.E.2d 90 (Ind.Ct. App.1994). The court in that case affirmed the disorderly conduct conviction of Radford, a former hospital employee whose unpleasant encounter with a police officer inside the hospital led to public disturbance. *Id.* at 91–92. After receiving a report that Radford had been removing hospital property from her former work station, the police officer approached the employee in a hospital hallway near the OB–GYN clinic. *Id.* at 91. When the officer asked her to step into an alcove to avoid obstructing traffic in the hallway and demanded to see the contents of the box she was carrying, Radford "loudly protested" and "continually got angry and in a very loud and abusive voice." *Id.* at 91–92. The officer asked Radford to "quiet down" at least three times, but she refused. *Id.* Radford was then charged and convicted of disorderly conduct under an Indiana statute prohibiting a person from making "unreasonable noise and continu[ing] to do so after being asked to stop." *Id.* at 92, 94.

On appeal, the court initially reversed the conviction, holding that Radford's speech "was [protected] political speech . . . protesting the legality and appropriateness of police conduct." *Id.* at 92. The court, however, reheard the case and affirmed the conviction. *Id.* at 91. The court opined that the statutory prohibition of unreasonable noise was "content-neutral" and

applied to the volume of Radford's speech. *Id.* at 92. Additionally, the court observed that the type of speech in which Radford engaged was not "purely political" in nature and that the "forum" of Radford's speech "was a quiet hallway of a hospital .... adjacent to the OB–GYN clinic and close to the recently born baby nursery." *Id.* at 94. It characterized Radford's loud speech as "harmful and abusive" and stated that it "destroyed [the patients'] right to a quiet and peaceful environment." The court concluded, therefore, that "Radford made unreasonable noise and continued to do so after being asked to stop, as required for conviction under [the applicable Indiana statute]."

*Radford* is readily distinguishable from the case before us on several grounds. Most importantly, unlike the present case, the officer in *Radford* never directed his orders at the content of speech. He offered instructions only to "quiet" the volume of Radford's unreasonably noisy voice, not to limit her word choice. In addition, the incident in *Radford* occurred entirely within the confines of the hospital walls and near the OB–GYN clinic where patients were likely to be disturbed, and the court was persuaded that this setting should be protected from "disturbing noise" for the "safety of those hospitalized." The episode in the present case, by contrast, took place near the Human Resources Department and eventually *outside* of the hospital. There is no evidence in the record that patients were under treatment nearby or that the area adjacent to Human Resources, like an OB–GYN clinic, required special noise control. It is also notable that Polk was arrested *after* she had left the building. The exchange between Corporal Sperl and Polk reached its pinnacle, not inside the hospital, but as she was walking outside to the parking garage. Only then, when Polk was outside the hospital and away from any sensitive areas, did Corporal Sperl decide to take her into custody, even though the volume of her voice at that point was much less of a concern. One can only speculate whether the events that transpired inside the hospital formed the basis for Polk's arrest, unlike in *Radford* where the events and arrest occurred wholly inside the hospital walls.

Additional aspects of the majority's analysis in this case are similarly troublesome. The majority contends that "ample testimony before the trial court" supports that "Corporal Sperl issued orders aimed, in the main, at the volume of Ms. Polk's speech." Majority at 14. This conclusion is defective for several reasons. First, the majority accepts the proposition that Corporal Sperl's orders were volume-based despite Corporal Sperl's own testimony establishing that he told Polk to "stop [her] profanity" and "stop [her] cursing." Under the majority's analysis, police would be permitted to justify content-based speech restrictions by claiming an intention to reduce the volume of one's voice. This precedent encourages unlawful regulation of an individual's message under the pretext of noise control.

In addition, the majority's reasoning inappropriately concentrates on the officer's "aim" in issuing his order. In other words, the majority allows a police officer's subjective intentions to dictate the Court's evaluation of the police command's lawfulness. The Court, instead, should focus its analysis on the actual words used by the Corporal. A reasonable person would have no reason to believe that *only* the *volume* of his or her voice is the target of an order to "stop your cursing" or "stop your profanity." The plain meaning of those specific references to speech content would lead a reasonable person to conclude that the officer objects to the message the speaker is conveying. The Court should not require one in Polk's position to obey a facially content-based police order because the officer intended his mandate to reach only the speaker's volume.

Yet, the majority makes a significant effort to highlight the volume of Polk's speech. It pinpoints the testimony describing Polk's behavior as "screaming," "tirades of vulgarity," and "yelling." The emphasis on the actual volume of Polk's speech, however, is only a diversion from the consequential issue. If Corporal Sperl ordered Polk to refrain from cursing, as he did, the particular order is still subject to strict First Amendment scrutiny even if the sound of Polk's voice carried across the Chesapeake Bay. Polk's "use of vulgar language

does not evolve into a crime simply because persons in the area stopped, looked, and listened." *Diehl,* 294 Md. at 478, 451 A.2d at 122. One violates Section 121(b)(3) only by wilfully failing to obey a lawful command, and the State has not presented sufficiently compelling reasons for justifying the content-based orders to Polk that she "stop [her] cursing" and "stop [her] profanity." Consequently, Corporal Sperl's orders unlawfully restricted the content of Polk's speech.[4] In the absence of a lawful order, Polk's conviction of disorderly conduct under Section 121(b)(3) cannot be supported by the evidence.

Because Polk's conviction for disorderly conduct is without support, it follows necessarily that the evidence does not support her conviction of resisting arrest. It is well settled that, "one illegally arrested may use any reasonable means to effect his escape, even to the extent of using such force as is reasonably necessary." *Diehl,* 294 Md. at 479, 451 A.2d at 123 (citing *Rogers v. State,* 280 Md. 406, 373 A.2d 944, *cert. denied,* 434 U.S. 928, 98 S.Ct. 412, 54 L.Ed.2d 287 (1977); *Sugarman v. State,* 173 Md. 52, 195 A. 324 (1937)); *see State v. Wiegmann,* 350 Md. 585, 607, 714 A.2d 841, 851 (1998) ("[W]e decline to abolish the long-standing common law privilege permitting persons to resist an illegal warrantless arrest"). Corporal Sperl's orders to Polk were unlawful, so his subsequent arrest of her for violating those orders was also illegal.

---

4. Other circumstances in this case undermine the State's position that Corporal Sperl issued a "reasonable and lawful order" under Section 121(b)(3). Assuming the orders in this case were lawful, which they were not, I question whether they were reasonable under the circumstances. The trial testimony suggests that the officer may have shared some of the responsibility for aggravating the commotion in the hospital. Upon first encountering Polk on the day of the incident, Corporal Sperl held her pay stub above his head and out of her reach while he asked a Human Resources employee whether he could turn it over to Polk. Even when Polk began walking toward the hospital exit to leave, Corporal Sperl followed close behind, commenting provocatively, "I feel sorry for your child." It is within this context—a tense situation made worse by the officer's inflammatory conduct—that Corporal Sperl then ordered Polk not to talk. I would decline to construe Section 121(b)(3) in a manner that punishes a citizen's emotional yet nonviolent response to a taunting police officer.

Polk's use of force in resisting that illegal arrest, therefore, did not constitute a crime.

### IV.   Conclusion

By deferring to the trial court's conclusion that Corporal Sperl directed his orders at Polk's volume, the majority ignores an essential aspect of this Court's role as a appellate body.   The majority opts to avoid the highly significant constitutional issue in this case in favor of upholding a police order, which, it admits, was at least partially directed at Polk's speech content.   Majority at 14 ("The record contains ample testimony before the trial court supporting its finding that Corporal Sperl issued orders aimed, *in the main*, at the volume of Ms. Polk's speech.") (emphasis added).   Because Corporal Sperl's orders restricted the content of Polk's speech, they were not "lawful and reasonable" as required by Section 121(b)(3).   Thus, Polk had no obligation to comply with the officer's orders or submit to the arrest.   I would reverse the judgment of the Court of Special Appeals.

BELL, C.J. and ELDRIDGE, J., authorize me to state that they join in this dissent.